1   Chiharu G. Sekino (SBN 306589)
2   **MILLER SHAH LLP**
3   1230 Columbia Street, Suite 1140
    San Diego, CA 92101
4   Telephone: (619) 235-2416
    Facsimile: (866) 300-7367
5   Email: cgsekino@millershah.com

6
    *Attorneys for Plaintiff-Relator*
7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11  | UNITED STATES OF AMERICA; the | Case No.:  3:20-cv-00286-W-AGS |
12  | States of CALIFORNIA, COLORADO, | |
    | CONNECTICUT, DELAWARE, | **PLAINTIFF-RELATOR'S** |
13  | FLORIDA, GEORGIA, HAWAII, | **MEMORANDUM OF POINTS AND** |
    | ILLINOIS, INDIANA, IOWA, | **AUTHORITIES IN OPPOSITION TO** |
14  | LOUISIANA, MARYLAND, | **DEFENDANTS' MOTION TO** |
    | MASSACHUSETTS, MICHIGAN, | **DISMISS FIRST AMENDED** |
15  | MINNESOTA, MONTANA, | **COMPLAINT** |
16  | NEVADA, NEW JERSEY, NEW | |
    | MEXICO, NEW YORK, NORTH | Ctrm: 3C – Hon. Thomas J. Whelan |
17  | CAROLINA, OKLAHOMA, RHODE | |
18  | ISLAND, TENNESSEE, TEXAS, | *First Amended False Claims Act* |
    | VIRGINIA, and WASHINGTON; the | *Complaint Filed August 19, 2021* |
19  | DISTRICT OF COLUMBIA; ex rel., | |
20  | EVEREST PRINCIPALS, LLC, | |
21  |                Plaintiffs and Relator, | |
22  | v. | |
23  | ABBOTT LABORATORIES, INC. | |
24  | a/k/a ABBOTT LABORATORIES, | |
    | ABBOTT CARDIOVASCULAR | |
25  | SYSTEMS, INC., and ABBOTT | |
26  | VASCULAR, INC., | |
27  |                Defendants. | |
28

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

I.      INTRODUCTION .......................................................................................... 1

II.     PROCEDURAL STATUS ............................................................................. 2

III.    STATEMENT OF FACTS ............................................................................. 3

        A.      Abbott's Kickback Schemes ............................................................. 3

        1.   Abbott's Illegal Tactics of "Owning the Referral" ............................. 3

        2.   Abbott's Illegal Tactics of Building Partnerships with Physicians...... 4

        B.      Abbott's Attempts to Conceal its Kickback Schemes ........................ 5

IV.     ARGUMENT.................................................................................................. 5

        A.      Standard Of Review ......................................................................... 5

        B.      The AC Sufficiently Alleges Violations Of The Act .......................... 6

        1.   The AC Sufficiently Sets Forth A Fraudulent Scheme....................... 7

                a.   Abbott's "partnerships" with implanting physicians .................... 8

                b.   Abbott's use of "clinical trials" and "CMS lobbying" as inducements
                     for its scheme ............................................................................. 13

        2.   The AC Sufficiently Sets Forth Scienter............................................ 15

        3.   Violations Of The AKS Are Material To The Government ............... 17

        4.   Abbott's Scheme Caused The Government To Reimburse False
             Claims................................................................................................ 17

                a.   The AC establishes that false claims were submitted................... 20

                b.   The AC establishes that Abbott caused the submission of the false
                     claims .......................................................................................... 21

                c.   Abbott's remaining causation argument is meritless ................... 23

        C.      The AC's Non-Federal Claims Should Not Be Dismissed................ 25

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andresen v. Int'l Paper Co.*,
   2014 WL 2511283 (C.D. Cal. June 3, 2014) ..................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................5

*Berg v. Popham*,
   412 F.3d 1122 (9th Cir. 2005) ........................................................................6

*Burrage v. United States*,
   571 U.S. 204 (2014) ......................................................................................23

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ......................................................................24

*Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*,
   42 F.3d 1541 (9th Cir. 1994) ........................................................................15

*Doe v. U.S.*,
   419 F.3d 1058 (9th Cir. 2009) ...........................................................6, 11, 17

*Druding v. Care Alternatives, Inc.*,
   164 F. Supp. 3d 621 (D.N.J. 2016) ...............................................................10

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993, 998 (9th Cir. 2010) ..........................................................passim

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ..........................................................................................6

*Guilfoile v. Shields*,
   913 F.3d 178 (1st Cir. 2019) .........................................................................22

*Hampton v. Steen*,
   2017 WL 11573592 (D. Or. Nov. 13, 2017) .................................................24

*Hanlester Network v. Shalala*,
   51 F.3d 1390 (9th Cir. 1995) ............................................................2, 7, 12

*Hart v. Publicis Touchpoint Sols., Inc.*,
   821 F. App'x 557 (6th Cir. 2020) ..........................................................23

*Health Choice Grp., LLC v. Bayer Corp.*,
   2018 WL 3637381 (E.D. Tex. June 29, 2018)............................11, 20, 21

*Jones-McNamara v. Holzer Health Sys.*,
   630 F. App'x 394 (6th Cir. 2015) ..........................................................23

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) ...................................................................6

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007)................................................................................16

*Strom ex rel. U.S. v. Scios, Inc.*,
   676 F. Supp. 2d 884 (N.D. Cal. 2009) ..................................................18

*Synovus Bank v. Okay Properties, LLC*,
   2012 WL 3745280 (W.D.N.C. Aug. 28, 2012) .....................................10

*U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*,
   597 F. Supp. 2d 1280 (M.D. Fla. 2009)................................................24

*U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ...................................8, 10, 13, 16

*U.S. ex rel. Brown v. Celgene Corp.*,
   2014 WL 3605896 (C.D. Cal. July 10, 2014)................................passim

*U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*,
   579 F.3d 13 (1st Cir. 2009)...................................................................18

*U.S. ex rel. Frazier v. IASIS Healthcare Corp.*,
   812 F. Supp. 2d 1008 (D. Ariz. 2011) ..................................................21

*U.S. ex rel. Grayson v. Genoa Healthcare*,
   2011 WL 2670079 (W.D. Wash. July 6, 2011)...............................20, 21

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*,
   41 F. Supp. 3d 323 (S.D.N.Y. 2014) ....................................................19

*U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,
    472 F.3d 702 (10th Cir. 2006) ........................................................................23

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
    812 F. Supp. 2d 39 (D. Mass. 2011) ................................................................7

*United States ex rel. Arnstein v. TEVA Pharms. USA, Inc.*, *("Teva I")*,
    2016 WL 750720 (S.D.N.Y. Feb. 22, 2016)..........................................8, 22, 25

*United States ex rel. Brown v. Celgene Corp. ("Brown II")*,
    226 F. Supp. 3d 1032 (C.D. Cal. 2016) ...........................................................13

*United States ex rel. Camburn v. Novartis Pharms. Corp.*,
    2020 WL 1436706 (S.D.N.Y. Mar. 24, 2020) ..........................................17, 24

*United States ex rel. Campie v. Gilead Scis., Inc.*,
    862 F.3d 890 (9th Cir. 2017) .............................................................................7

*United States v. Caris Life Scis., Inc.*,
    2013 WL 11579021 (N.D. Tex. Oct. 23, 2013).................................................12

*United States ex rel. Chin v. CVS Pharmacy, Inc*,
    2017 WL 4174416 (C.D. Cal. Aug. 15, 2017) ...........................................12, 14

*United States ex rel. Dan Abrams Co. LLC v. Medtronic, Inc.*,
    2017 WL 4023092 (C.D. Cal. Sept. 11, 2017) ...........................................20, 25

*United States ex rel. Dan Abrams Co. v. Medtronic, Inc.*,
    2018 WL 5266863 (C.D. Cal. June 7, 2018) ....................................................23

*United States ex rel. Dunlap v. Alaska Radiology Assocs., Inc.*,
    2017 WL 6048167 (D. Alaska Mar. 31, 2017)...........................................20, 21

*United States ex rel. Durkin v. Cty. of San Diego*,
    2018 WL 3361148 (S.D. Cal. July 10, 2018) ...................................................17

*United States ex rel. Fitzer v. Allergan, Inc.*,
    2021 WL 4133713 (D. Md. Sept. 10, 2021)......................................................16

*United States ex rel. Gough v. Eastwestproto, Inc.*,
    2018 WL 6929332 (C.D. Cal. Oct. 24, 2018).............................................12, 13, 24

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
    880 F.3d 89 (3d Cir. 2018).........................................................22, 23, 24

*United States ex rel. King v. Solvay Pharms., Inc.*,
  871 F.3d 318 (5th Cir. 2017) ..................................................................23

*United States ex rel. Kuzma v. N. Arizona Healthcare Corp. ("Kuzma I")*,
  2020 WL 5819568 (D. Ariz. Sept. 30, 2020) ...........................................21

*United States ex rel. Kuzma v. N. Arizona Healthcare Corp., ("Kuzma II")*,
   2021 WL 120901 (D. Ariz. Jan. 13, 2021) ...............................15, 16, 17

*United States ex rel. Macias v. Pac. Health Corp.*,
  2019 WL 2396305 (C.D. Cal. June 5, 2019) ............................................17

*United States ex rel. McGrath v. Microsemi Corp.*,
  690 F. App'x 551 (9th Cir. 2017) ............................................................16

*United States ex rel. Solis v. Millennium Pharms., Inc.*,
  445 F. Supp. 3d 786 (E.D. Cal. 2020) ...............................20, 21, 23, 25

*United States v. Adventist Health*,
  2020 WL 2522114 (E.D. Cal. May 18, 2020) ...................................13, 23

*United States v. Borrasi*,
  639 F.3d 774 (7th Cir. 2011) ....................................................................8

*United States v. Chang*,
  2017 WL 10544289 (C.D. Cal. July 25, 2017).................................7, 9, 10

*United States v. Corinthian Colls.*,
  655 F.3d 984 (9th Cir.2011) .................................................................6, 15

*United States v. Crescendo Bioscience, Inc.*,
  2020 WL 2614959 (N.D. Cal. May 23, 2020)...................................15, 16

*United States v. Ctr. for Diagnostic Imaging, Inc.*,
  787 F. Supp. 2d 1213 (W.D. Wash. 2011)...............................................13

*United States v. Davis*,
  132 F.3d 1092 (5th Cir. 1998) ...................................................................8

*United States v. Greber*,
  760 F.2d 68 (3d Cir. 1985)........................................................................8

*United States v. Hong*,
  938 F.3d 1040 (9th Cir. 2019) .................................................................11

*United States v. Kats*,
   871 F.2d 105 (9th Cir. 1989) ...................................................................2, 7, 8, 11

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ........................................................................17, 24

*United States v. Mallory*,
   988 F.3d 730 (4th Cir. 2021) .................................................................................8

*United States v. Mathur*,
   2012 WL 4742833 (D. Nev. Sept. 13, 2012) ......................................................14

*United States v. McClatchey*,
   217 F.3d 823 (10th Cir. 2000) ...............................................................................8

*United States v. N. Am. Health Care, Inc.*,
   2015 WL 6871781 (N.D. Cal. Nov. 9, 2015) ................................................10, 18

*United States v. Orthopedic All., LLC*,
   2020 WL 8173025 (C.D. Cal. Nov. 19, 2020) ................................................18, 19

*United States v. Teva Pharm. USA, Inc. ("Teva II")*,
   2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019).............................................13, 20, 22

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ..............................................................................6

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
   953 F3d 1108 (9th Cir. 2020) ..............................................................................15

**Statutes**

28 U.S.C. § 1367(a) ..................................................................................................25

31 U.S.C. §§ 3729-33..................................................................................................1

31 U.S.C. §§ 3729(a)(1)(A)-(B) .........................................................................7, 17

42 U.S.C. § 1320a-7b(b) ........................................................................................1, 7

Tex. Hum. Res. Code § 36.0011 and § 39.032(a)(4)..............................................25

Tex. Hum. Res. Code § 36.002(1)-(13) ..................................................................25

**Rules**

Fed.R.Civ.P. 9(b) ................................................................................passim

Fed.R.Civ.P. 12(b) ................................................................... 2, 5, 11, 12

**Regulations**

Medicare & State Health Care Programs: Fraud & Abuse; OIG Anti-Kickback
   Provisions,
   56 Fed. Reg. 35952-01 (July 29, 1991) ......................................................7

1    I.    **INTRODUCTION**

2       On behalf of the United States of America ("United States") and the Plaintiff-

3 States identified in the First Amended Complaint ("AC") (collectively, and together

4 with the United States, the "Government"), Plaintiff-Relator, Everest Principals, LLC

5 (hereinafter "Plaintiff" or "Relator"), respectfully submits this Memorandum of Law

6 in Opposition to the Motion to Dismiss the First Amended Complaint ("Motion") and

7 supporting Memorandum ("Memo") filed by Defendants, Abbott Laboratories, Inc.,

8 a/k/a Abbott Laboratories, Abbott Cardiovascular Systems, Inc. and Abbott Vascular

9 Inc., (collectively, "Abbott" or "Defendants").

10       This is a civil action brought on behalf of the United States pursuant to the

11 False Claims Act, 31 U.S.C. §§ 3729-33 (the "FCA" or "Act") and analogous and

12 applicable state laws, based upon Abbott's creation of false claims and violations of

13 the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS").  As set forth in the

14 AC, Abbott engaged in a nationwide kickback scheme to induce physicians and

15 hospitals to use its MitraClip Device ("MC Device") for cardiac patients covered by

16 Medicare, TRICARE, the Veterans Administration, Medicaid, and other state- and

17 federally-funded healthcare programs (together hereinafter referred to as "Government

18 Healthcare Program(s)").  Specifically, under the guise of educational and business

19 meetings, Abbott systematically provided doctors and hospitals with remuneration in

20 the form of patient referrals and practice building, free marketing, substantial

21 honoraria for sham speaker programs, clinical trial opportunities, and free lavish

22 meals and cocktail parties.  Abbott's purported speaker events, conferences, and

23 business meetings contained little or no educational content, and, instead, served as a

24 mechanism for it to unlawfully influence doctors and hospitals.  These sham events

25 were intended to, and did, cause doctors to refer patients and perform procedures to

26 implant Abbott's MC Device that were then reimbursed by Government Healthcare

27 Programs.  The claims submitted to Government Healthcare Programs for the MC

28 Device, tainted by the kickbacks, are false claims within the meaning of the FCA.

Abbott attempts to challenge the legal sufficiency of the claims asserted in the AC pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) through its Motion, which blatantly misstates both the facts and law.  Because it cannot legitimately confront the averments of the AC to support its position, Abbott's Motion instead creates its own set of facts and legal propositions.[1]  As explained below, under applicable and controlling precedent, Plaintiff's AC is well pled.  As a result, Plaintiff respectfully submits that Abbott's misguided attempts should not be permitted to stand, and its Motion should be denied in its entirety.

## II.  **PROCEDURAL STATUS**

Relator filed the initial complaint under seal on February 14, 2020, the Government declined to intervene on March 25, 2021,[2] and the complaint was unsealed pursuant to the Court's Order dated March 26, 2021. [Dkt. Nos. 1, 8, 9.] Abbott moved to dismiss the initial complaint on July 29, 2021, [Dkt. No.30], and Relator filed a notice on August 16, 2021 indicating that it intended to file, as of right, an amended complaint. [Dkt. No. 31.] Relator filed the AC on August 19, 2021 [Dkt. 35.], and Defendants filed their Motion on September 17, 2021 [Dkt. No.45].

---

[1]One example of Abbott's misstatements is in its citation to AC ¶ 66 for the proposition that ""[u]se of the MitraClip in any particular patient occurs only with the approval of multiple independent decision makers involved in the patient's care." AC, ¶ 66. Memo, at 3.  Not only does this self-serving statement not appear in the cited paragraph, it is a red herring intended to buttress Abbott's incorrect application of a "but-for" causation argument under the AKS. This Circuit has held that an action violates the AKS when just *one* purpose of the remuneration was to induce a referral. *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989).  In addition, Abbott incorrectly asserts a "temporal proximity" requirement for the AKS. Memo, at 12. This assertion mischaracterizes Relator's pleadings. One purpose of Abbott's payments was to induce continued referrals and reward past referrals. As such, Abbott's temporal argument is irrelevant here. Abbott also suggests it is immune from liability under the FCA because of an "ambiguous statutory requirement." Memo, at 23.  Not true.  This Circuit has already found that "[t]he [AKS] gives fair warning of what is prohibited and is not unconstitutionally vague." *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995).

III.   **STATEMENT OF FACTS**

   **A. Abbott's Kickback Schemes**

Relator was employed by Abbott in its Structural Heart Division from August 2015 to April 2017 and has first-hand knowledge and documentation of the kickback tactics Abbott used to induce doctors and hospitals to refer patients and implant them with Abbott's MC Device.  AC ¶¶ 5, 5 n.2, 64-128.

   **1.  Abbott's Illegal Tactics of "Owning the Referral"**

As Relator alleges in the AC, to induce physicians and hospitals to use its MC Device instead of the other treatment options,[3] Abbott engaged in a systematic and nationwide kickback scheme, the central aspect of which involved providing remuneration to hospitals and implanting doctors in the form of patient referrals and patient practice building. *Id.*, ¶¶ 66-128.  A key target of this scheme was the referring physician, and, as detailed in the AC, Abbott's management expected its employees to "own the referral" by hosting free luncheons and social events for referring physicians and for specific, targeted implanting physicians and hospitals. Abbott also expected its

---

[3]As explained in the AC, the MC Device is an FDA-approved treatment option for Mitral Regurgitation ("MR"), a condition that occurs when the heart's mitral valve fails to close properly, thereby disrupting transvalvular blood flow. AC, ¶ 58. MR is often mild, progresses slowly, and people with MR can be asymptomatic for many years.  MR typically occurs in two forms: Degenerative MR ("DMR") and Functional MR ("FMR").  *Id.*  Abbott asserts that Relator cannot prove causation because the MC Device is the only FDA-approved Transcatheter Mitral Valve Repair ("TMVR") treatment.  Not only is Abbott's assertion based on an incorrect legal standard, it is also based on a false factual premise.  While the MC Device is the only FDA-approved TMVR device, it is not the only treatment option for MR.  Indeed, as explained in the FAC, surgical repair for DMR offers durable treatment with favorable outcomes, and there are also other treatment options for FMR, for example, Guideline Directed Medical Therapy, which combines, *inter alia*, pharmacological prescriptions and cardiac resynchronization therapy. *Id.*, ¶¶ 59-60. Abbott repeatedly directed its sales representatives to present a biased message to referring physicians to direct patients to get the MC Device *without* regard for patient- specific conditions *Id.*, ¶ 126. Abbott's directive ignores important treatment considerations, as stated by the Mayo Clinic, treatment of MR depends on the severity of the condition, whether it is progressing, and whether there are symptoms. *Id.*, ¶ 58.

employees to track the identities of the patients' referring physicians, the implanting physicians, and the number of MC Devices used for each patient referral so that Abbott could determine if its inducements to specific referring physicians were paying off in the form of patient referrals for the use of its MC Device by targeted implanting physicians. *Id.*, ¶¶ 71-77, 83. The AC also provides multiple specific examples of the free marketing lunches and dinners Relator hosted, with management's oversight and direction, for specific implanting physicians (referenced by their initials) and implanting hospitals to grow their patient practice through referring physicians' (referenced by their initials) patient referrals. *Id.*, ¶¶ 84-110. The AC also provides a sample of the MC Device procedures for Relator's implanting physicians from referral physicians (that Abbott tracked using the Salesforce database), as well as the approximate amount of reimbursement the physician and hospital received for the MC Device and implanting procedures for the referred patients from 2015-2016. *Id.* ¶ 96. In addition, the AC provides a representative sample of false claims based on CMS physician and hospital Medicare estimated reimbursement amounts for the TMVR procedure and MC Device, and Abbott's payments to the implanting physicians. *See* Exhibit A to AC.

### 2. Abbott's Illegal Tactics of Building Partnerships with Physicians

Through its "partnership" scheme, Abbott organized, paid for, and hosted illegal marketing and promotional events such as sham speaker programs, free meals, lavish cocktail parties, and socializing events for targeted implanting physicians and hospitals to partner with them for their mutual business benefit of building the physicians' and hospitals' patient practice, in exchange for using its MC Device. *Id.*, ¶¶ 79-92, 94, 98, 106-107, 109-110. In addition, Abbott "partnered" with its targeted implanting physicians and hospitals by offering participation in clinical trials, which represented an opportunity for these doctors to secure funding, prestige, and additional patients. For Abbott, this was another opportunity to keep its "partners" happy and loyal, to validate its MC Device with its stable of partner physicians, and to push for

greater CMS coverage and reimbursement. *Id.*, ¶¶ 103-115.

### B.    Abbott's Attempts to Conceal its Kickback Schemes

During its employment at Abbott, Relator reported concerns to Abbott management and Human Resources Department, as well as its Office of Ethics and Compliance, yet received no response concerning any investigatory or remedial actions taken to address Defendants' violations of the AKS. *Id.*, ¶¶ 67, 78, 122. For example, during a November 12, 2015 meeting, Relator openly stated that Abbott's practices sounded like "practice-building," yet instead of addressing his/her concerns, Relator's manager, Michael Meadors, abruptly ended the meeting. *Id.*, ¶ 69.  Further, Abbott attempts to conceal its scheme in its internal documents; for example, its 2Q16 Structural Heart Quota and Compensation Rollout document states that "Abbott must not engage in activities aimed *solely* to help a MitraClip implanting site (customer) build their practice…" *Id.*, ¶ 116.  This instruction was misguided, as an action violates the AKS when just one purpose of the remuneration is aimed to induce a person to use a service or product.  Abbott also concealed its scheme by hiding meal costs at events such as the 2017 TMVR Summit, where Abbott employee, Ms. Oh, confirmed the per person charge to be $267.63, an amount well over internal and industry limits.  *Id.*, ¶ 121. Finally, Abbott attempted to conceal its biased marketing scheme to ensure the MC Device is widely used, i.e., that "everything can be clipped", by instructing their implanting physicians to "beta block the s#@t" out of patients who experience dangerously elevated valve gradient levels as a result of the MC Device procedure, all to ensure that the MC Device is widely used. *Id.*, ¶¶ 126-127.

## IV.    ARGUMENT

### A.    <u>Standard Of Review</u>

A complaint meets the rigors of Rule 12(b)(6) if it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a complaint states a plausible claim for relief, the court must "draw on [its] judicial experience and common sense," *Iqbal,* 556 U.S. at 679, and consider "'obvious alternative explanation[s].'" *Id.* at 682. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *United States v. Corinthian Colls*., 655 F.3d 984, 991 (9th Cir.2011). In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007), and draw all reasonable inferences in favor of Relator.  *See Doe v. U.S.*, 419 F.3d 1058, 1062 (9th Cir. 2009); *Berg v. Popham*, 412 F.3d 1122, 1125 (9th Cir. 2005).

Rule 9(b) also applies because the FCA is an anti-fraud statute, which the complaint meets when the circumstances constituting fraud, *i.e.*, the "who, what, when, where, and how of the misconduct charged" are alleged with particularity, but conditions of a person's mind may be alleged generally.  *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d993, 998 (9th Cir. 2010). The Rule 9(b) standard is generally met where the plaintiff alleges "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  However, "[t]he 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b).'" *Andresen v. Int'l Paper Co.*, 2014 WL 2511283, at \*5 (C.D. Cal. June 3, 2014) (citation omitted).  "Rather, the rule is context specific and flexible." *Id.*  Moreover, "[w]hile the factual circumstances of the fraud itself must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged generally." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (citation omitted).  As set forth below, the AC thoroughly meets the requisite pleading standards and dismissal is unwarranted.

### B.   The AC Sufficiently Alleges Violations Of The Act

"The AKS prohibits any person from offering any kind of remuneration to

induce the purchase, order, or recommendation 'of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *U.S. ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *7 (C.D. Cal. July 10, 2014) (quoting 42 U.S.C. § 1320a-7b(b)).  "Courts have broadly defined 'remuneration,' interpreting it to mean 'anything of value.'" *United States v. Chang*, 2017 WL 10544289, at *7 (C.D. Cal. July 25, 2017) (citing cases); *see Hanlester Network*, 51 F.3d at 1398.[4] And, the AKS covers "any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals." *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 47 (D. Mass. 2011) (citing *Kats*, 871 F.2d 108 and other cases).

The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A)-(B).  All government reimbursement claims "tainted" by violations of the AKS are false claims under the FCA.  *See Brown*, 2014 WL 3605896, at *8 ("the government would not knowingly reimburse kickback-tainted claims").  To prevail on a claim under the FCA, a plaintiff must show: "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (citation omitted).

### 1.  The AC Sufficiently Sets Forth A Fraudulent Scheme

As is all too familiar to the Government and courts, many pharmaceutical companies operate illegal schemes to induce physicians and hospitals to prescribe or

---

[4]*See also* Medicare & State Health Care Programs: Fraud & Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) (codified at 42 C.F.R. pt. 1001) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever").

use their products, such as under the guise of "educational" speaker programs.  *See Special Fraud Alert: Speaker Programs*, Department of Health and Human Services, Office of Inspector General (Nov. 16, 2020);[5] *see, e.g.*, *U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497 (S.D.N.Y. 2014); *United States ex rel. Arnstein v. TEVA Pharms. USA, Inc.* ("*Teva I*"), 2016 WL 750720 (S.D.N.Y. Feb. 22, 2016). Abbott's scheme here involves and expands upon these pharmaceutical companies' illegal tactics.

As alleged in the AC, Abbott provided remuneration to targeted physicians and hospitals through sham speaker programs and lavish social events.  *Id.*, ¶¶ 65, 79, 88-92, 94, 97-100, 107-108.  Abbott also enlisted doctors in its lobbying initiatives, for which they would benefit greatly through increased Government reimbursement payments.  *Id.*, ¶¶ 113-115.  Abbott's scheme, in addition, focused on providing remuneration in the form of building the implanting physicians' practices as an inducement, *id.*, ¶ 66, *i.e.*, Abbott "partnered with" and actively assisted physicians and hospitals in building their patient base in exchange for their use of the MC Device on their cardiac care patients.  Indeed, Abbott's "owning the referral" tactics violate the AKS because one obvious purpose of Abbott's free marketing and promotional activities, *i.e.*, the remuneration, was to induce the referral of services to implanting physicians. *See, e.g.*, *United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *United States v. Borrasi*, 639 F.3d 774, 781–82 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *Kats*, 871 F.2d at 108; *United States v. Greber*, 760 F.2d 68, 71–72 (3d Cir. 1985).

### a.  *Abbott's "partnerships" with implanting physicians*

Through its "partnership" scheme, Abbott sponsored and facilitated, at its expense, events such as the aforementioned sham speaker programs, free meals, lavish

---

[5] *Available at* https://oig.hhs.gov/documents/special-fraud-alerts/865/SpecialFraudAlertSpeakerPrograms.pdf (last visited October 8, 2021).

cocktail parties and various other forms of remuneration for targeted implanting physicians to promote themselves to and generate referrals from non-implanting physicians. *Id.*, ¶¶ 79-92, 94, 98, 106-107, 109-110.  Another aspect of Abbott's "practice building" was to offer implanting physicians a role in its clinical trials, which provided free publicity and prestige among their colleagues, and thus attracted new patients and referrals. *Id.*, ¶¶ 103-104.  Of course, "practice building" (as well as the other aspects of Abbott's scheme) is remuneration under the AKS because of its value to the implanting physicians. *See Chang*, 2017 WL 10544289, at *17 ("Courts have broadly defined 'remuneration,' interpreting it to mean 'anything of value'"); *see, e.g.*, *Covidien to Pay Over $17 Million to The United States for Allegedly Providing Illegal Remuneration in the Form of Practice and Market Development Support to Physicians*, https://www.justice.gov/opa/pr/covidien-pay-over-17-million-united-states-allegedly-providing-illegal-remuneration-form (March 11, 2019); AC, ¶ 85 (citing industry authorities).

Abbott makes a series of assertions for its argument that the "practice building" allegations do not satisfy Rule 9(b), but none of their assertions have any merit. Memo, at 16-20.  First, Abbott contends that those allegations are "too vague" and are "never actually explain[ed]." *Id.*  But Abbott then goes on to contradict itself.  As Abbott explains, the AC alleges that, through the "practice building" scheme, "Abbott illegally facilitated referrals to implanting physicians 'in *exchange* for [their] performing the TMV procedure with MC devices.'" Memo, at 17 (quoting AC, ¶ 86) (emphasis added by Abbott).  Abbott argues, however, that these allegations are too conclusory. *Id.*  But the AC expressly provides at least 21 specific examples where Relator was personally "required to provide inducing meals that were primarily social in nature to referring physicians with no legitimate purpose as part of the marketing services that Abbott undertook on behalf of the MC Device implanting physicians in order to build their practices." AC, ¶ 84.

These instances include, *inter alia*: (1) a $376.04 marketing lunch with referral

physician Dr. D.W.L. for implanting physicians Dr. S.B. and Dr. S.K. on October 23, 2015; (2) a $855.35 dinner at Flemings Steakhouse with wine and martinis and a group of referring doctors from Gilbert Cardiology for implanting physician Dr. H.N. on January 12, 2016; and (3) a $687.85 dinner with referral physician Dr. M.M. for implanting physician Dr. M.P.  AC, ¶ 84(a), (e), (j).  Such detailed allegations specify the "who, what, when, where, and how" of Abbott's "practice building" scheme, and are more than sufficient to meet Rule 9(b).  *See, e.g.*, *Chang*, 2017 WL 10544289, at *11 ("Relators identify the specific date ranges of the RIC Partners' unlawful upcoding, the type of patient and visit that correspond with the upcoded claims, examples of codes used versus the codes which should have been used, and the disproportional high-level charges each RIC Partner submitted in comparison to the statewide averages"); *Brown*, 2014 WL 3605896, at *9 ("as a direct participant in Celgene's off-label promotion, Brown 'sets out the particular workings of a scheme that was communicated directly to [her] by those perpetrating the fraud'"); *Bilotta*, 50 F. Supp. 3d at 516 (the allegations "describe specific examples of alleged sham speaker events, as well as specific doctors who were repeat speakers or attendees"); *United States v. N. Am. Health Care, Inc.*, 2015 WL 6871781, at *6 (N.D. Cal. Nov. 9, 2015) (relator's description of scheme through "first-hand information" sufficient).[6]

Abbott attempts to pick at these detailed allegations by pointing out that, as they do not indicate how many people attended those meals to show that the costs were unreasonable, the "far more plausible explanation" is that those meals were "routine educational programs."  Memo, at 18-19.  There are at least three problems with this attempted critique.  First, some of these meals included alcohol, which "routine educational programs" do not include.  AC, ¶ 84(e), (j).  Second, and more importantly, these were meals that Relator personally hosted and affirmed were for

---

[6] Accordingly, *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621 (D.N.J. 2016) and *Synovus Bank v. Okay Properties, LLC*, 2012 WL 3745280 (W.D.N.C. Aug. 28, 2012), which Abbott cites (Memo, at 16), are inapposite.

illicit "practice building." *Id.*, ¶ 84.  Third, these events could both be "educational" and illicit, if, in addition to any education, "one purpose of the payment was to induce future referrals." *Kats*, 871 F.2d at 108; *see United States v. Hong*, 938 F.3d 1040, 1048 (9th Cir. 2019) (remunerations spent on overhead expenses were still "kickbacks" under the AKS if intended to induce future referrals).  Accordingly, Abbott is impermissibly asking the Court to draw unreasonable inferences in its favor in direct contradiction to the facts alleged in the AC and the Rule 12(b)(6) standard. *Cf. Doe*, 419 F.3d at 1062.[7]

Similarly, Abbott argues that the hospital inducement allegations are "conclusory" because the example provided in the AC only describes the marketing materials used for the event, but does not identify "who attended the summit or what even took place there."  Memo, at 18.  To the contrary, the AC describes exactly what occurred at the January 2017 TMVR Summit – attendees, including hospital administrators, reveled at a five-star luxury resort even though the per person spend calculation vastly exceeded Abbott's limits; the presentation slide decks were not vetted, but the speakers were nonetheless paid through phony accounts payable numbers; and Abbott's "educational materials" were simply marketing materials hyping the "competitive edge" the MC device would bring to the provider.  AC, ¶¶ 98, 100, 120-121.  The AC illustrates the first fact, with details on how Abbott's personnel massaged the numbers (*id.*, ¶¶ 120-123); the second fact with Dr. R.G., whose "presentation" included "only a few, non-educational, and non-substantive slides that he prepared himself" and who received $2,500 from Abbott anyhow; and Dr. G.T., who attended an "off-label" procedure performed earlier in the day and then addressed more than 100 other physicians at the Summit by stating that the procedure was the "future of cardiac procedures'" (*id.*, ¶¶ 125, 128); and the third fact with, as

---

[7]In contrast, the relators in *Health Choice Grp., LLC v. Bayer Corp.*, failed to present such details.  *See* 2018 WL 3637381, at *45 (E.D. Tex. June 29, 2018) ("[r]elators have not met their burden of 'sufficiently pleading the time, place, or identity details'" of the scheme).

Abbott concedes, "a lengthy description of marketing materials for hospitals." *Id*., ¶ 100.  Accordingly, these allegations readily meet the Rule 9(b) standard as well.[8]

Finally, Abbott argues that the Relator's allegations of implanting physicians receiving remuneration directly through sham speaker programs and lavish social events are insufficient for Rule 9(b) because, in the three examples illustrated in the AC, there is no explanation as to how the honoraria the implanting doctors received "exceeded market value" or how the presentations were "non-educational" or "non-substantive." Memo, at 20.[9] As a preliminary matter, the AC provides examples of more than three implanting physicians. AC, ¶¶ 71, 88, 92, 106, Ex. A (Drs. M.P., H.N., A.P., R.G., D.S., etc.).  In any event, the fatal defect of Abbott's argument is, once again, the fact that Relator was personally responsible for those implanting physicians and hosted and facilitated their speaker events, and thus is personally aware that the presentations were "shams."  *See, e.g.*, *id.*, ¶¶ 88 ("These speaker programs and luncheons that Relator hosted for Dr. M.P. offered him a generous fee in the form of a 'speaker honorarium'…."); 92 ("Through speaker programs and events Relator hosted for [Drs. H.N. and A.P.]…."); and 125 ("Relator's other Arizona targeted implanting physician, Dr. A.P.").

Relator's first-hand experience is sufficient to establish that the programs and

---

[8]These details are based on Relator's personal experience, obviating Abbott's citation to *United States ex rel. Gough v. Eastwestproto, Inc.*, 2018 WL 6929332, at *6 (C.D. Cal. Oct. 24, 2018) regarding "information and belief" allegations, and surpass "mere encouragement," as discussed in *Hanlester Network*, 51 F.3d at 1398.  In *United States v. Caris Life Scis., Inc.*, to which Abbott also cites, the allegations failed to plausibly suggest that false claims were submitted, in contrast to the AC, as discussed in Section III.B.4, *infra.*  2013 WL 11579021, at *12 (N.D. Tex. Oct. 23, 2013)

[9]Abbott attempts to denigrate the fact that the AC identifies only three implanting physicians used as examples for these allegations.  Memo, at 19-20.  But Abbott does not, because it cannot, argue that three discrete and specific examples are insufficient under Rule 9(b) or 12(b)(6).  *See United States ex rel. Chin v. CVS Pharmacy, Inc*, 2017 WL 4174416, at *7 (C.D. Cal. Aug. 15, 2017) ("courts do not require qui tam plaintiffs asserting a nationwide scheme to plead each and every instance of fraudulent conduct").

events were "shams." *See, e.g.*, *Brown*, 2014 WL 3605896, at *9.[10] Indeed, the AC even describes Dr. R.G.'s slide deck presentation of "a few, non-educational, and non-substantive slides that he prepared himself." *Id.*, ¶ 125.  This level of granularity exceeds what other courts have found sufficient to establish speaker programs as "shams." *See Bilotta*, 50 F. Supp. 3d at 518 (pleadings sufficiently established speaker programs as "shams" with allegations that "no substantive presentation or discussion about Novartis drugs took place, but the doctors who were 'speakers' were nonetheless compensated").[11] And, by establishing that these speaker program events were complete "shams," Relator also establishes that the honorarium paid vastly exceeded fair market value because the fair market value for sham speaker programs is zero.  *See United States v. Teva Pharm. USA, Inc.* ("*Teva II*"), 2019 WL 1245656, at *15 (S.D.N.Y. Feb. 27, 2019) ("Because these programs had no legitimate purpose, except to reward or increase speaker prescriptions, any payments made to speakers for these programs would exceed 'fair market value'").[12]

### b. *Abbott's use of "clinical trials" and "CMS lobbying" as inducements for its scheme*

---

[10]Tellingly, Abbott relies on a subsequent opinion in *Brown* -- a decision on a motion for summary judgment -- for its argument that the fraudulent scheme is not adequately pled.  Memo, at 20 (citing to *United States ex rel. Brown v. Celgene Corp.* ("*Brown II*"), 226 F. Supp. 3d 1032 (C.D. Cal. 2016)).  There, the court found (after denying the motion to dismiss that challenged the sufficiency of pleading the overall scheme, which included the speaker program allegations, *Brown*, 2014 WL 3605896, at *9-*10), that "Brown has no evidence that Celgene considered the number of prescriptions a doctor had written in deciding whether to employ the doctor as a speaker." *Brown II*, 226 F. Supp. 3d at 1055.  Thus, *Brown II* is completely inapposite.

[11]Abbott suggests, without any authority, that "sham" is a legal conclusion.  "Sham," in the context of a pharmaceutical speaker program, is simply a factual allegation that the speaker events were not educational in nature.  *See Bilotta*, 50 F. Supp. 3d at 502.

[12]Abbott's cited authorities discussed paying above-market rates for actual services, not sham speaker program honoraria.  *See United States v. Adventist Health*, 2020 WL 2522114, at *7 (E.D. Cal. May 18, 2020) (management services); *Gough*, 2018 WL 6929332, at *8 (ambulance services); *United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1223 (W.D. Wash. 2011) (imaging services).

1      As explained above and in the AC, Abbott's "practice-building" scheme

2   included offering prestigious and publicity-generating clinical trials to participating

3   implanting physicians.  AC, ¶¶ 103-104.  While Abbott contends that the AC does not

4   describe such trials (Memo, at 20-21), the AC identifies Abbott's COAPT clinical trial

5   as an example of both what was being studied and when.  *Id.*, ¶ 61.  Further, it

6   explains how clinical trials are valuable to implanting physicians, including direct

7   payments, and how they serve as inducement; the mutually beneficial arrangement

8   was contingent on participant physicians' continued use of the MC Device.  *Id.*, ¶¶ 96

9   n.16, 103-104, 114 n.20.  While the AC did not provide details regarding all of

10   Abbott's clinical trials, along with every doctor and hospital participating, it *has*

11   sufficiently established how clinical trials fit within the remuneration scheme as an

12   *element* of that framework, not an entirely separate, "undeveloped theory." Ex. A.

13   Such allegations are sufficient under Rule 9(b).  *See Chin*, 2017 WL 4174416, at *7.

14      Abbott attacks the lobbying allegations (AC, ¶¶ 113-115) on similar grounds.

15   Memo, at 21.  Once again, the participation of Abbott's implanting physician

16   "partners" is an extension of its scheme and the benefits of the results of the lobbying

17   are also clearly a form of Abbott's remuneration for their MC device usage.  The AC

18   identifies many of these lobbying "partners," all of whom have high MC device usage

19   rates as reflected by their CMS reimbursements and received substantial payments

20   from Abbott in return for their services.  AC, ¶ 115, Ex. A (*e.g.*, Dr. T.B., who

21   received $4.3 million in CMS reimbursements for the MC Device and TMVR

22   procedure from 2015-2017 and received $47,000.00 from Abbott).  Such direct links

23   further illustrate Abbott's overall scheme to induce implanting physicians to use its

24   MC Device, and Abbott's invocation on its First Amendment right to petition the

25   Government is a *non sequitur*.  *See United States v. Mathur*, 2012 WL 4742833, at *4

26   (D. Nev. Sept. 13, 2012) ("Courts have uniformly rejected the notion that bribery is

27   protected speech," and the defendant "cites no case supporting his proposition the

28   [AKS] has been successfully challenged on First Amendment grounds").

## 2.  The AC Sufficiently Sets Forth Scienter

Even though Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake," "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).  "The Ninth Circuit has interpreted Rule 9(b) to mean 'plaintiffs may aver scienter generally, just as the rule states - that is, simply by saying that scienter existed.'" *United States v. Crescendo Bioscience, Inc.*, 2020 WL 2614959, at *9 (N.D. Cal. May 23, 2020) (quoting *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1547 (9th Cir. 1994)); *see United States ex rel. Kuzma v. N. Arizona Healthcare Corp.* ("*Kuzma II*"), 2021 WL 120901, at *3 (D. Ariz. Jan. 13, 2021) (noting that even though the AKS's scienter requirement requires a "knowing and willful violation" while "reckless disregard" suffices for scienter under the FCA, such allegations still "need not be pleaded with particularity – a general allegation will suffice under Rule 9(b)") (citing *Corinthian Colleges*, 655 F.3d at 996).  "[T]he Ninth Circuit [has also] specified that [in pleading the knowledge element of the FCA], '[a] complaint needs only to allege facts supporting a plausible inference of scienter.'" *Crescendo Bioscience, Inc.*, 2020 WL 2614959 at *9 (quoting *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F3d 1108, 1122 (9th Cir. 2020)).

Here, the AC has satisfied the Rule 9(b) standard by pleading generally and the FCA pleading requirements by providing sufficient factual allegations to plausibly allege that Abbott acted knowingly and willfully.  First, Relator alleges that, based on personal experience as an Abbott employee, Abbott and its employees knew that "practice-building" like the scheme it employed constituted a violation of the AKS. AC, ¶ 69.  Indeed, as Relator sets forth, an Abbott Account Manager, Nathan Foreman, confirmed as much in a meeting with Relator and its manager, Michael Meadors, on November 12, 2015. *Id.*  Second, the AC alleges the specific steps that Abbott's personnel took to disguise its social gatherings as "educational" programs. *Id.*, ¶¶ 119-128.  This included: (1) characterizing any costs exceeding the $125.00 per

person limit as a "room charge" at the first TMVR Summit as a "room charge" to CMS reporting requirements; (2) using separate credit cards to disassociate event expenses; (3) padding attendee lists to reduce the per-person spending; and (4) using phony Accounts Payment numbers to pay physician speakers.  *Id.*, ¶¶ 120-121, 123-125.  Third, the AC identifies Abbott's internal guidance, as well as the scheme's violations of such guidance, and Relator's corresponding attempts to alert Abbott that its "partnership" program was violating such guidance.  *Id.*, ¶¶ 122, 124, 126.

Such allegations are, individually and collectively, more than sufficient to establish scienter at the pleading stage.  *See, e.g.*, *Kuzma II*, 2021 WL 120901, at *3 (relator's personal knowledge" as to company practices established scienter); *Crescendo Bioscience, Inc.*, 2020 WL 2614959, at *9, *11 (text messages and emails stating fee waivers should not be in writing established scienter); *Bilotta*, 50 F. Supp. 3d at 520 (Novartis's internal policies and acknowledgment of industry standards supported scienter).  In contrast, the scienter allegations in Abbott's authorities fail because they did not contain such facts.  *See United States ex rel. Fitzer v. Allergan, Inc.*, 2021 WL 4133713, at *8 (D. Md. Sept. 10, 2021) (court found the scienter allegations too conclusory, in contrast to others where "relators pointed to specific efforts by the defendants to disguise illegal payments as lawful fees"); *United States ex rel. McGrath v. Microsemi Corp.,* 690 F. App'x 551, 552 (9th Cir. 2017) (affirming dismissal of complaint where the relator did not plausibly allege that compliance with the International Traffic in Arms Regulation ("ITAR") was material to the Government and the defendant's interpretation of the term "disclose" under ITAR was reasonable at the time) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007));[13]

---

[13]In *Safeco*, the Supreme Court affirmed the district court's grant of summary judgment and explained that there was insufficient evidence of scienter because the defendant's reading of the Fair Credit Reporting Act was supported by "the statutory text and relevant court and agency guidance." 551 U.S. at 70 n.20.  Abbott does not contend here that its "partnership" program was sanctioned by any court or agency guidance on the AKS or the FCA; in fact, as discussed above, the program violated its own internal policies.

*United States ex rel. Camburn v. Novartis Pharms. Corp.*, 2020 WL 1436706, at \*5 (S.D.N.Y. Mar. 24, 2020) (complaint made "no allegations about why sales personnel concealed the excessive spending, whether they were instructed to do so, who the falsification was meant to deceive, or what role the falsification played in the alleged kickback scheme"); *United States ex rel. Durkin v. Cty. of San Diego*, 2018 WL 3361148, at \*7 (S.D. Cal. July 10, 2018) (plaintiff failed to explain how that defendant's representative knew that the information he certified was false).

Indeed, faced with these well-pled allegations, Abbott is reduced to making contentions that directly contradict those allegations and the pleading standard: it argues that its partnership program and related speaker events, clinical trials, (luxurious) summits, and (lubricated) events were simply different aspects of its efforts to "educate" doctors, while its employees' efforts to conceal costs do not suggest an illegal kickback because such activity "could be explained by any number of reasons unrelated to the AKS." Memo, at 22-24. Such arguments are improper on a motion to dismiss. *See Doe*, 419 F.3d at 1062.

### 3. Violations Of The AKS Are Material To The Government

Abbott does not, because it cannot, dispute that "compliance with the AKS is material for the purpose of the FCA." *United States ex rel. Macias v. Pac. Health Corp.*, 2019 WL 2396305, at \*7 (C.D. Cal. June 5, 2019).

### 4. Abbott's Scheme Caused The Government To Reimburse False Claims

"[T]he [FCA] holds a defendant liable if it pursues a scheme that ultimately results in the submission of a false claim, even if the defendant does not participate in the actual submission of the claim." *Kuzma II*, 2021 WL 120901, at \*5 (citing 31 U.S.C. § 3729(a)(1)(A)-(B); *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001)). The Ninth Circuit has made clear that, "in accord with general pleading requirements under Rule 9(b), [] it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Ebeid*, 616 F.3d at 998-99 (citation omitted).

Indeed, the Ninth Circuit expressly noted that a plaintiff "need not[] provide representative examples to establish the payment element of the prima facie case." *Id.* at 999 n.4.  This approach is "particularly [applicable] where, as here, [Abbott] is alleged to have induced third parties to submit false claims . . . [so] the relator cannot reasonably be expected to allege details about the individual claims that were submitted." *Brown*, 2014 WL 3605896, at *9 (citing *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 29 (1st Cir. 2009)).

For example, in *Brown*, the relator described the fraudulent scheme in detail and noted, among other things, that, by the defendant's "own estimates[,] 'Medicare and Medicaid paid for the majority" of the prescriptions for the drugs at issue.  2014 WL 3605896, at *9.  Thus, the court found it "easy to infer that claims for non-reimbursable, off-label uses were submitted to Medicare and Medicaid," even though the relator did not "provide the details of any representative false claim caused by Celgene's alleged misconduct." *Id.* (citing *Ebeid*, 616 F.3d at 999).  Similarly, in *United States v. Orthopedic All., LLC*, the relator identified specific doctors involved in the kickback scheme who had "performed many hip and knee surgeries on Medicare eligible patients." 2020 WL 8173025, at *7 (C.D. Cal. Nov. 19, 2020).  Thus, despite agreeing with the defendants that such allegations do not "prove that any particular [d]efendant [d]octor submitted a Medicare claim," those facts, "[t]aken together with the allegation that 75% of the surgeries performed using OA hardware were billed to Medicare . . . rise to the level of 'reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* (quoting *Ebeid*, 616 F.3d at 998); *see also N. Am. Health Care, Inc.*, 2015 WL 6871781, at *6 (allegation of a particular false claim not necessary where relator provided "specific examples of kickbacks" and identified the "percentage of . . . residents whose bills were paid with Medicare funds"); *Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884, 893-4 (N.D. Cal. 2009) (details of the claims, "such as the names of the doctors or the date of the treatment," "unnecessary at the pleading stage" where the complaint "provides exhaustive

allegations" relating to the "fraudulent inducement of doctors").

Here, as in *Brown* and *Orthopedic All., LLC*, Relator has alleged "'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Ebeid*, 616 F.3d at 998-99. The median age for the procedure is 76, indicating that the overwhelming percentage of such patients are covered by Medicare. *Id.* ¶ 60 n.6.[14] And, as set forth in Section V.B.1, *supra*, the AC details Abbott's scheme, provides examples from Relator's personal experience, and identifies many physicians whom Abbott targeted. AC, ¶¶ 65-66, 79-92, 94, 97-98, 100, 106-110, 113-115, 119-128. The AC also provides sample lists of Medicare reimbursements that many of these physicians received for implanting the MC Device, as well as the dates of the procedures those physicians performed on patients referred through Abbott's practice-building scheme and the Abbott proctoring representative involved in those procedures. *Id.*, ¶¶ 92-96, 115, Ex. A. For example, Dr. M.P., one of the physicians for whom Relator was responsible, was a participant in Abbott's "practice building" through at least 2015-2016 and received remuneration in the form of sham speaker program honorariums and sponsored marketing events to generate referrals that year. *Id.*, ¶¶ 84(b)-(d), (k)-(u), 88-91. The AC identifies 25 instances in which Dr. M.P. implanted the MC Device during that same period from referrals obtained through Abbott's scheme and the same period in which Dr. M.P. and his or her hospital received $1.2 million in estimated reimbursements for the procedures. *Id.* ¶ 96.

"Congress made clear that . . . any claim connected in any way to an AKS violation was ineligible for reimbursement, even if the party that submitted the claim had no knowledge of the AKS violation." *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 41 F. Supp. 3d 323, 335 (S.D.N.Y. 2014) (citing 155 Cong. Rec. S10852–01,

---

[14]The link set forth in the FAC appears to have been updated to:
https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=273 (last visited October 5, 2021).

2009 WL 3460582); *see Brown*, 2014 WL 3605896, at *8 ("the government would not knowingly reimburse kickback-tainted claims"). Accordingly, as all the Medicare reimbursement claims submitted by the participating physicians were tainted by those physicians' involvement in Abbott's "partnership" scheme, all those claims are false under the FCA. *See Teva II*, 2019 WL 1245656, at *21 ("taint" theory can be proven by establishing that the program had a "universal and improper" purpose).

### a. The AC establishes that false claims were submitted

Abbott asserts three arguments disputing these well-pled allegations. First, Abbott argues that the AC fails to allege that any false claims were submitted. Memo, at 6-10. As discussed above, Section IV.B.4, the AC has more than met the standard set forth in *Ebeid* by alleging "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." 616 F.3d at 998-99. Abbott's authorities provide no reason to deviate from that conclusion. In *United States ex rel. Solis v. Millennium Pharms., Inc.*, the relator failed to "identify even a single claim submitted by anyone who attended the meals." 445 F. Supp. 3d 786 (E.D. Cal. 2020). Similarly, the relator in *United States ex rel Dan Abrams Co. LLC v. Medtronic, Inc.* did not "identify any physicians, or categories of them, who actually received payment in connection with decisions—in which they participated—to purchase or use of any of the Subject Devices." 2017 WL 4023092, at *11 (C.D. Cal. Sept. 11, 2017). Unlike those instances, the AC identified the implanting physicians, their involvement in Abbott's scheme, and their Medicare-covered operations. *E.g.*, AC, ¶¶ 84, 96, Ex. A.

Unlike the AC, the allegations in Abbott's remaining authorities failed to establish *Ebeid*'s preceding requirement of setting forth "particular details of a scheme to submit false claims." *See Health Choice Grp., LLC*, 2018 WL 3637381, at *45; *United States ex rel. Dunlap v. Alaska Radiology Assocs., Inc.*, 2017 WL 6048167, at *3 (D. Alaska Mar. 31, 2017) ("Dunlap fails to set forth any facts indicating that Drs. Winn, Coyle, Kottra, Tauschek, or Powers knowingly received remuneration in

violation of the Anti-Kickback statute"); *U.S. ex rel. Grayson v. Genoa Healthcare*, 2011 WL 2670079, at *3 (W.D. Wash. July 6, 2011) (the complaint "cites the outdated [agency authority] for the proposition that the routine waiver of copayments resulted in false claims"); *U.S. ex rel. Frazier v. IASIS Healthcare Corp.*, 812 F. Supp. 2d 1008, 1017 (D. Ariz. 2011) ("none of [the relator's] examples provide any reliable indicia that IASIS physicians were performing medically unnecessary procedures for Medicare/Medicaid patients").  As the relators' failed to detail a fraudulent scheme in those instances, the courts there could not infer that any false claims were submitted.[15]

### b.  The AC establishes that Abbott caused the submission of the false claims

Second, Abbott argues that the AC fails to allege that it induced any false claims.  Memo, at 10-13.  An AKS-based FCA claim does not, however, require proof that the wrongdoer "induced" the submission of false claims; courts have roundly rejected "but for" causation for these types of claims.  *See United States ex rel. Kuzma v. N. Arizona Healthcare Corp.* ("*Kuzma I*"), 2020 WL 5819568, at *6 (D. Ariz. Sept. 30, 2020) ("courts reject the suggestion that a relator must prove 'but for' causation – that a false claim would not have been made without the kickback") (citing cases). "This is because the focus of the AKS is not the success of the bribe, but the bribe

---

[15]Moreover, as in *Solis* and *Dan Abrams Co., LLC* and also unlike the AC, the allegations in those authorities were too generalized to serve as "reliable indicia" linking the alleged scheme to Government reimbursement.  *See Health Choice Group, LLC*, 2018 WL 3637381, at *48 ("Relators do not allege any information as to dates or amounts of any false claims for reimbursement to Medicare, Medicaid, or any other federal health care program"); *Dunlap*, 2017 WL 6048167, at *4 ("merely pleading that a defendant performed a large number of procedures that allegedly included some false claims does not constitute reliable indicia of the submission of actual false claims"); *Grayson*, 2011 WL 2670079, at *3 ("the complaint merely states generally that Genoa pharmacies "fill approximately 1,500–2,000 prescriptions for Medicare beneficiaries per month"); *Frazier*, 812 F. Supp. 2d at 1018 ("These general allegations [that approximately 400 heart surgeries were performed] fail to support a reasonable inference that IASIS had submitted claims for federal reimbursement for any medically unnecessary procedures performed on any federally-insured patient").

itself." *Teva I*, 2016 WL 750720, at *17.  Accordingly, the "rule of the Third, Fifth, Seventh, Ninth, and Tenth Circuits . . . [is] that 'the Relator need only prove that 'one purpose' of remuneration is to induce a person to use a service for which payment is made under a federal health care program.'" *Id.* (citing cases).

To establish that "one purpose," the relator need only establish a "link" between the kickback and the claim for reimbursement.  *See Teva II*, 2019 WL 1245656, at *24.  "Put simply,

> [A] claim is false if it seeks reimbursement for a prescription that was not provided in compliance with the Anti-Kickback Statute, regardless of whether the claim was the result of a quid-pro-quo exchange or would have been submitted even absent the kickback. *See Greenfield*, 880 F.3d at 96. Relators need not show that a quid pro quo exchange occurred, or that the physicians would not have prescribed Defendant's medication but for the kickbacks. It is sufficient to show that Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs, even if the physician would have prescribed those drugs absent the kickback."

*Id.* (citation omitted); *see United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96 (3d Cir. 2018) ("Greenfield does not need to prove HSI/HANJ's referrals actually caused their members to use a particular healthcare provider. A 'link' is required, but it is less than espoused by Accredo").[16] Accordingly, in addition to being outside the operative AC, it is irrelevant whether, as Abbott asserts, MitraClip is the "only" FDA-approved transcatheter device (though not the only treatment for the condition (AC, ¶¶ 58-59)) or that the AC does not allege that it was medically unnecessary.

Here, the AC also establishes the requisite "link." As discussed above, Section IV.B.1-2, *supra*, Abbott offered implanting physicians and hospitals remuneration

---

[16] *Greenfield* is currently the highest authority on this issue.  Though the Ninth Circuit has yet to address it, the First Circuit has since followed the Third Circuit.  *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019)

through, *inter alia*, assistance in "practice building," direct monetary compensation through honorariums for sham speaker programs, lavish social events, and inclusion in clinical trials and lobbying efforts, for the primary purpose of inducing MC Device usage.  And, as discussed in Section IV.B.4, *supra*, the AC identifies specific examples of the tainted Medicare reimbursement claims made by physicians who participated in Abbott's scheme.  Abbott tacitly acknowledges the *Greenfield* paradigm,[17] and argues in the alternative that the AC fails to provide the "link" because the reimbursement claims identified in the AC do not have sufficient "temporal proximity" with the remuneration the participating physicians received.  To the extent there is a separate "temporal proximity"[18] requirement even though the *Ebeid* standard is already met, the AC satisfies it.  *Compare, e.g.*, AC, ¶ 84(b)-(d) (k)-(u) (events for Dr. M.P. ranging from October 2015 to September 2016), *with id.*, ¶ 96 (instances of Dr. M.P. implanting the MC Device from July 2015 to April 2016).

### c. Abbott's remaining causation argument is meritless

Finally, Abbott resorts to a series of factual *non sequiturs* to contest the AC's causation allegations.  First, Abbott argues -- beyond the four corners of the AC again

---

[17]The authorities that Abbott cites for applying an "actual inducement" or "but-for" causation standard provide no support.  *See Hart v. Publicis Touchpoint Sols., Inc.*, 821 F. App'x 557, 562 (6th Cir. 2020) (no evidence of AKS violation on summary judgment); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401-404 (6th Cir. 2015) (same); *Solis*, 445 F. Supp. 3d at 800 (relator had no basis as on original source to claim scheme resulted in false claims); *Burrage v. United States*, 571 U.S. 204, 211 (2014) (Controlled Substances Act conviction required "but for" causation).
[18]Abbott relies on *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006), which concerned allegations of a false budget payment request irrelevant to the AKS, for its "temporal proximity" argument.  Defendants' other authorities are similarly irrelevant.  *See United States ex rel. Dan Abrams Co. v. Medtronic, Inc.*, 2018 WL 5266863, at *8 (C.D. Cal. June 7, 2018) (relator failed to cure deficiencies with describing the alleged scheme with sufficient detail to meet Rule 9(b)); *Adventist Health*, 2020 WL 2522114, at *8 (relator failed to allege plausible scheme, precluding any link); *United States ex rel King v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017) (no evidence on summary judgment that physicians were compensated to prescribe to Medicaid patients).

-- that it is more likely that the physicians used the MC Device because it is the only FDA-approved option for the operation.  Memo, at 13-14.  Second, and relatedly, Abbott argues that there are too many intervening actors, such as hospitals and referring doctors, to attribute usage of the MC Device to Abbott's scheme.  *Id.*, at 14-15.  Third, Abbott argues Relator "cannot establish causation through the generic allegation that Abbott sought to boost sales." *Id.*, at 15.

As a preliminary matter and contrary to Abbott's misleading assertion, while the MC Device is the only FDA-approved TMVr device, TMVr is not the only procedure for treating MR.  AC, ¶¶ 58-59.  Regardless, these arguments are red herrings because, as discussed above, Section IV.B.4.b, *supra*, a Government reimbursement claim is a false claim under the FCA if it is tainted by an AKS violation.  *See Greenfield*, 880 F.3d at 97-98 (requiring that a plaintiff to "prove [that] a kickback actually influenced a patient's or medical professional's judgment . . . would dilute the False Claims Act's requirements vis-à-vis the Anti–Kickback Statute" . . . "neither [law] requires a plaintiff to show that a kickback directly influenced a patient's decision to use a particular medical provider")*.  As discussed above as well, the AC meets the *Greenfield* standard.  *See* Section IV.B.4.b, *supra*.[19]

---

[19]Once again, virtually none of Abbott's authorities counsel otherwise.  *See United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (FCA liability attaches even if the defendant did not personally submit false claim); *Gough*, 2018 WL 6929332, at *6 (relators failed to detail scheme to meet Rule 9(b) despite their "former executive and management positions"); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (relator's inability to detail false claims despite her access to defendant's records implied that no false claims were submitted); *Hampton v. Steen*, 2017 WL 11573592, at *7 (D. Or. Nov. 13, 2017) (discussing proximate causation element for RICO claim); *Camburn*, 2020 WL 1436706, at *6 (return-on-investment analysis did not, in it of itself, indicate a fraudulent scheme).  While *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1292 (M.D. Fla. 2009) required a "strong and direct causal link," there was no AKS claim at issue and it predates and contravenes *Greenfield* and the majority of the more recent authorities on the causation element.

### C.    The AC's Non-Federal Claims Should Not Be Dismissed

As discussed above, the AC has sufficiently alleged violations of the AKS and FCA, so the Court retains supplemental jurisdiction over the state and municipal *qui tam* claims. 28 U.S.C. § 1367(a).  Moreover, as Abbott's scheme has been specifically detailed to infer that false claims have been submitted pursuant to *Ebeid*, such allegations are sufficient for Rule 9(b) with respect to the individual states as well.

Indeed, certain of the state laws are more expansive than their federal counterpart.  For example, Abbott's arguments do not apply to the Texas causes of action, as liability for the majority of unlawful acts, pursuant to the plain and ordinary language of the Texas Medicaid Fraud Prevention Act ("TMFPA"), do not require the presentment of a false claim.  Tex. Hum. Res. Code § 36.002(1)-(13).  For the same reason, Relator is not required to plead that Defendants' commission of an unlawful act "'caused to be presented' a false claim for payment." Memo, at 13. Further, under the TMFPA, the sole requisite scienter is that a person acted "knowingly," the TMFPA does not impose a "willful" scienter standard.  Tex. Hum. Res. Code § 36.0011.  The two cases cited by Abbott to support dismissal of the state claims, *Solis*, 445 F. Supp. 3d 786 and *Abrams*, 2017 WL 4023092, are inapplicable to the Texas cause of action as those decisions focused on false claims analyses.[20]

As for the Massachusetts False Claims Act, though Relator is an entity, the entity is used as a vehicle to protect its sole member, who is a natural person and thus qualifies under that act.  AC, ¶ 5 n.2.  To the extent the Court requires more detail with respect to the individual states, however, Relator requests that such claims be stayed pending resolution of the federal claims. *See Teva I*, 2016 WL 750720, at *28.

### V.    CONCLUSION

For the reasons stated above, Abbott's Motion should be denied in its entirety.

---

[20] The Texas Supreme Court has held that TMFPA differs from the FCA, among other fraud-prevention acts, holding that the statutes, "while similar in aim and tactic, employ materially different language, and the language of our statutes controls the outcome here." *In re Xerox*, 555 S.W.3d 518, 535 (Tex. 2018).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**MILLER SHAH LLP**

Dated:  October 12, 2021

*/s/ Casey T. Yamasaki*
Chiharu G. Sekino (SBN 306589)
Casey T. Yamasaki (SBN 335445)
Two Columbia Place, Suite 1140
1230 Columbia Street
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367
Email: cgsekino@millershah.com
            ctyamasaki@millershah.com

James E. Miller (SBN 262553)
Laurie Rubinow (admitted *phv*)
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
            lrubinow@millershah.com

Jonathan K. Tycko (admitted *phv*)
Tycko & Zavareei LLP
828 L Street, NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile:  (202) 973-0950
Email: jtycko@tzlegal.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Monique Olivier (SBN 190385)
Christian Schreiber (SBN 245597)
Olivier Schreiber & Chao, LLP
201 Filbert Street, Suite 201
San Francisco, CA
Telephone: (415) 484-0980
Email: monique@osclegal.com
            christian@osclegal.com

*Attorneys for Plaintiff-Relator*