Monique Olivier (SBN 190385)
monique@os-legal.com
Christian Schreiber (SBN 245597)
christian@os-legal.com
OLIVIER & SCHREIBER LLP
475 14th Street, Suite 250
Oakland, CA 94612
Telephone: (415) 484-0980
Facsimile: (415) 658-7758

Chiharu G. Sekino (SBN 306589)
cgsekino@millershah.com
Casey T. Yamasaki (SBN 335445)
ctyamasaki@millershah.com
MILLER SHAH LLP
1230 Columbia Street, Suite 1140
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367

James E. Miller (SBN 262553)
jemiller@millershah.com
Laurie Rubinow (*Pro Hac Vice*)
lrubinow@millershah.com
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367

Jonathan K. Tycko (*Pro Hac Vice*)
jtycko@tzlegal.com
TYCKO & ZAVAREEI, LLP
1828 L Street, NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

*Attorneys for Relator Everest Principals, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*; *ex rel.* EVEREST PRINCIPALS, LLC,<br><br>    Plaintiffs and Relator,<br><br>        v.<br><br>ABBOTT LABORATORIES, INC. a/k/a ABBOTT LABORATORIES, ABBOTT CARDIOVASCULAR SYSTEMS, INC., and ABBOTT VASCULAR, INC.,<br><br>    Defendants. | ) Case No. 3:20-CV-0286-W-AGS<br>)<br>)<br>) **PLAINTIFF-RELATOR'S**<br>) **MEMORANDUM OF POINTS AND**<br>) **AUTHORITIES IN OPPOSITION TO**<br>) **DEFENDANTS' MOTION TO DISMISS**<br>) **SECOND AMENDED COMPLAINT**<br>)<br>) Date: November 14, 2022<br>) Crtrm: 3C – Hon. Thomas J. Whelan<br>)<br>)<br>)<br>) |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………..………………ii

I.      INTRODUCTION…………………………………………………………………1

II.     RELEVANT BACKGROUND ....................................................................................3

    A.  Relator Was Instructed to Promote Abbott's MC Device to Physicians and Hospitals. .......3

    B.  Abbott's Kickback Schemes. ..................................................................................4

    C.  Abbott Employs Kickback Schemes in Every Plaintiff State ................................5

III.    THE COURT SHOULD DENY ABBOTT'S MOTION ......................................9

    A.  Standard of Review................................................................................................9

    B.  Abbott Employed the Same Fraudulent Schemes to Defraud Both the Federal and the State
        Governments................................................................................................11

    C.  The SAC Sufficiently Alleges State FCA Violations. ........................................19

V.      CONCLUSION…………………………………………………………...…24

RELATOR'S MPA IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
Case No. 3:20-CV-0286-W-AGS

## Cases

*Andresen v. Int'l Paper Co.*,
   2014 WL 2511283 (C.D. Cal. June 3, 2014)......................................................... 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................. 9, 10

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ..................................................................... 10, 24

*Epstein v. Washington Energy Co.*,
   83 F.3d 1136 (9th Cir. 1996) ........................................................................ 10

*Foglia v. Renal Ventures Mgmt, LLC*,
   830 F. Supp. 2d 8 (D.NJ. 2011) ..................................................................... 14

*Health Choice Group, LLC v. Bayer Corp.*,
   2018 WL 3637381 (E.D. Tex. June 29, 2018) ...................................................... 18

*Hericks v. Lincare Inc.*,
   2014 WL 1225660 (E.D. Pa. Mar. 25, 2014) ....................................................... 17

*Touchpoint Sols., Inc.*,
   821 F. App'x 557 (6th Cir. 2020)................................................................... 18

*U.S. ex rel. Academy Health Center, Inc. v. Hyperion Foundation, Inc.*,
   2014 WL 3385189 (S.D. Miss. July 9, 2014)........................................................ 18

*U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ................................................................ 22

*U.S. ex rel. Brown v. Celgene Corp.*,
   2014 WL 3605896 ................................................................................. 10, 22

*U.S. ex rel. Buth v. Walmart, Inc.*,
   2019 WL 3802651 (E.D. Wis. Aug. 13, 2019)........................................................ 18

*U.S. ex rel. Carpenter v. Abbott Labs., Inc.*,
   723 F. Supp. 2d 395 (D. Mass. 2010) ............................................................ 15, 16

*U.S. ex rel. Chin v. CVS Pharmacy, Inc.*,
   2017 WL 4174416 (C.D. Cal. Aug. 15, 2017) ......................................... 12, 13, 22

*U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*,
   579 F.3d 13 (1st Cir. 2009)............................................................................... 11

*U.S. ex rel. Gough v. Eastwestproto, Inc.*,
   2018 WL 6929332 (C.D. Cal. Oct. 24, 2018) ................................................... 24

*U.S. ex rel. Harris v. Alan Ritchey, Inc.*,
   2006 WL 3761339 (W.D. Wash. Dec. 20, 2006) .............................................. 18

*U.S. ex rel. Hendow v. Univ. of Phx.*,
   461 F.3d 1166 (9th Cir. 2006) ........................................................................... 2

*U.S. ex rel. King v. Solvay S.A.*,
   823 F. Supp. 2d 472 (S.D. Tex. 2011) .............................................................. 16

*U.S. ex rel. Nowak v. Medtronic, Inc.*,
   806 F. Supp. 2d 310 (D. Mass. 2011) ................................................... 16, 17, 19

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
   906 F. Supp. 2d 1264 (N.D. Ga. 2012) ............................................................ 17

*U.S. ex rel. Solis v. Millennium Pharm., Inc.*,
   445 F. Supp. 3d 786 (E.D. Cal. 2020) .............................................................. 18

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
   778 F. Supp. 2d 709 (N.D. Tex. 2011) ........................................................ 17, 18

*United States ex rel. Kroening v. Forest Pharms., Inc.*,
   155 F. Supp. 3d 882 (E.D. Wis. 2016) ............................................................. 18

*United States ex rel. Rahimi v. Zydus Pharms*. (USA), Inc.,
   2017 WL 1503986 (D.N.J. Apr. 26, 2017) ....................................................... 16

*United States ex rel. Springfield Terminal Ry. v. Quinn*,
   14 F. 3d 645 (D.C. Cir. 1994) ............................................................ 5, 6

*United States v. Adventist Health*,
   2020 WL 2522114 (E.D. Cal. May 18, 2020) ...................................... 24

*United States v. Ctr. for Diagnostic Imaging, Inc.*,
   787 F. Supp. 2d 1213 (W.D. Wash. 2011) .......................................... 24

*United States v. Executive. Health Resources., Inc.*,
   196 F. Supp. 3d 477 (E.D. Pa. 2016) ................................................... 15

*United States v. Hong*,
   938 F.3d 1040 (9th Cir. 2019) ............................................................. 23

*United States v. Kats*,
   871 F.2d 105 (9th Cir. 1989) ............................................................... 23

*United States v. Medtronic PLC*,
   2022 WL 541604 (C.D. Cal. Feb. 23, 2022) ....................................... 10

*United States v. Medtronic, Inc.*,
   2017 WL 2653568 (E.D. Pa. June 19, 2017) ................................. 14, 15

*United States v. N. Am. Health Care, Inc.*,
   173 F. Supp. 3d 943 (N.D. Cal. 2016) ................................................. 12

*United States v. N. Am. Health Care, Inc.*,
   2015 WL 6871781 (N.D. Cal. Nov. 9, 2015) ...................................... 22

*United States v. Novartis Pharmaceutical Corp.*,
   2022 WL 4217749 (S.D.N.Y. Sept. 13, 2022) .................................... 19

*United States v. Teva Pharm. USA, Inc.*,
   2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) ..................................... 23

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ............................................................. 10

## Statutes

31 U.S.C. §§ 3729-33 ......................................................................................... 1

42 U.S.C. § 1320a-7b(b) .................................................................................... 1

G. L. c. 12, §§ 5A-5O ........................................................................................ 2

Maryland Code, Health - General, § 2-604(a)(7) .............................................. 2

## Rules

Fed.R.Civ.P. 9(b) ............................................................................................... 3

# I.  <u>INTRODUCTION</u>

On behalf of the United States of America ("United States") and the Plaintiff-States identified in the Second Amended Complaint ("SAC") (collectively, and together with the United States, the "Government"), Plaintiff-Relator, Everest Principals, LLC (hereinafter "Plaintiff" or "Relator"), respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss the Second Amended Complaint ("Motion") and supporting Memorandum ("Memo") filed by Defendants, Abbott Laboratories, Inc., a/k/a Abbott Laboratories, Abbott Cardiovascular Systems, Inc. and Abbott Vascular, Inc., (collectively, "Abbott" or "Defendants").

This is a civil action brought on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33 (the "FCA" or "Act") and on behalf of certain States ("Plaintiff States" or the "States") pursuant to analogous and applicable state laws, based upon Abbott's creation of false claims and violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS").  As set forth in the SAC, Abbott engaged in a nationwide kickback scheme to induce physicians and hospitals to use its MitraClip Device ("MitraClip" or "MC Device") for cardiac patients covered by Medicare, TRICARE, the Veterans Administration, Medicaid, and State Medicaid programs.  Specifically, under the guise of educational and business meetings, Abbott systematically provides doctors and hospitals with remuneration in the form of patient referrals and practice building, free marketing, substantial honoraria for sham speaker programs, clinical trial opportunities, and free lavish meals and cocktail parties.  Abbott's purported speaker events, conferences, and business meetings contained little or no educational content, and, instead, served as a mechanism for it to unlawfully influence doctors and hospitals. These sham events were intended to, and did, cause doctors to refer patients and

perform procedures to implant Abbott's MC Device that were then reimbursed by Medicare, State Medicaid Programs, and other Government Healthcare Programs.

Abbott previously moved to dismiss Relator's First Amended Complaint ("FAC"). See Dkt. No. 35; Dkt. No. 45. On August 18, 2022, the Court issued an order granting in part and denying in part that motion. Dkt. No. 56 ("Order"). The Court denied Abbott's motion to dismiss as to Relator's FCA and AKS Claims, agreeing that Relator had alleged with particularity: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due" Order at 16 (citing *U.S. ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006)). The Court granted Abbott's motion to dismiss as to Relator's State False Claims Act claims with leave to amend, finding that Relator had not alleged with particularity how any false claims were submitted to each state identified in the FAC. Order at 16-17.

Relator filed the SAC on September 22, 2022, alleging the State FCA counts (Claims IV through XXIX, hereafter, "State FCA Claims") with particularity. Dkt. No. 57. Specifically, Relator has added allegations demonstrating how false claims were submitted to the Plaintiff States, including, among other things, describing how Abbott applied its marketing schemes uniformly throughout the States and providing a representative sample of false claims based on State Medicaid physician reimbursement payments for the TMVR procedure, along with Abbott's payments to each implanting physician (SAC, Exhibit B).[1]

---

[1] The SAC does not pursue claims on behalf of the State of Maryland because that state has not elected to intervene in this action, thus, pursuant to Maryland Code, Health - General, § 2-604(a)(7), the claims must be dismissed. SAC ¶ 1 n. 2. The SAC also does not pursue claims on behalf of the Commonwealth of Massachusetts because, as the Court has previously held, as a corporation, Relator does not have

RELATOR'S MPA IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
Case No. 3:20-CV-0286-W-AGS

Through its Motion, Abbott now attempts to challenge the legal sufficiency of the State FCA Claims asserted in the SAC pursuant to Fed.R.Civ.P. 9(b). *See* Dkt. 59.[2] Those attempts must be rejected. Abbott's Motion blatantly misstates both the facts and law and presents a thinly veiled attempt to rehash the challenge to the federal FCA and AKS allegations which this Court has allowed to go forward.

First, Abbott's arguments ignore the role of the State FCA Claims in this action. The purpose of Relator's State FCA Claims is to recover, on behalf of the Plaintiff States, the *state* portion of the Medicaid payments on claims that are already included in Relator's federal FCA claims, due to the federal-state sharing of Medicaid costs. That is, Relator's State FCA Claims do not involve different claims, but instead are a subset of claims already at issue in Relator's federal claims. Because the Court has concluded that Relator has properly pled those federal claims, Relator has necessarily and properly pled the State FCA Claims. Second, to the extent any clarification of the pleadings was necessary, Relator's additional allegations now contain the necessary particularity with respect to the States to meet the requirements of Rule 9(b). *See, e.g.*, SAC ¶¶ 150-151, 163, 182.

As explained below, under applicable and controlling precedent, Relator's State FCA Claims are well pled and, as such, Abbott's Motion should be denied in its entirety.

## II.   **RELEVANT BACKGROUND**

### A.   **Relator Was Instructed to Promote Abbott's MC Device to Physicians and Hospitals.**

Relator's sole member was employed by Abbott in the company's Structural

---

standing to bring suit under the Massachusetts False Claims Act, G. L. c. 12, §§ 5A-5O.

[2]Despite naming their Motion "Motion to Dismiss Second Amended Complaint," Defendants only seek dismissal of Relator's State FCA Claims, Counts IV-XXIX of the SAC.

Heart Division from August 2015 to April 2017, SAC ¶¶ 5, 5 n.4, and was part of Abbott's "global workforce" tasked with marketing the MitraClip Device to physicians and hospitals. *Id*. ¶ 145. Abbott is a publicly traded, global healthcare company that currently owns the patent for the MitraClip. *Id*. ¶ 6. Abbott acquired the company that originally owned the patent for the MitraClip in 2009 for $410 million. *Id*. ¶ 143. The MitraClip is a medical device used during a transcatheter procedure called Transcatheter Mitral Valve Repair ("TMVR"), an FDA-approved treatment option for Mitral Regurgitation ("MR"), a condition that occurs when the heart's mitral valve fails to close properly, thereby disrupting transvalvular blood flow. *Id*. ¶¶ 139-145. The MC Device evolved from a well-known procedure first developed more than thirty years ago and is not the only treatment option available to MR patients. *Id*. ¶¶ 141-143. Abbott brags about training and deploying a global workforce to sell the MitraClip to medical facilities and physicians in order to "build a market expected to reach billions of dollars . . ." and confirms its efforts in that regard are "paying off." *Id*. Relator experienced firsthand how Abbott's marketing schemes are uniform across all States.[3]

### B. Abbott's Kickback Schemes.

The central aspect of Abbott's nationwide kickback scheme involves providing remuneration to hospitals and implanting doctors in the form of patient referrals and patient practice building. SAC ¶¶ 146-147. As Relator alleges in both the SAC and the FAC, instead of marketing the MitraClip through legitimate means, Abbott's entire marketing approach employed fraudulent schemes of bribing referring physicians through free expensive meals and other inducements so that

---

[3]Abbott's Motion mischaracterizes Relator's assigned territory as a "very limited geographical area." Memo, at 1. In fact, Relator's territory actually included the single largest MC Device implanting center (and physician) and center by volume in the United States, Dr. S.K., at Cedars Sinai Medical Center. *Id*. ¶ 163(a).

they would refer patients to physicians and hospitals who would implant the MC Devices. *Id.* ¶ 171. Abbott also bribed those implanting physicians to induce them to use the device. *Id.* The Court's Order found Relator's allegations of a nationwide fraudulent scheme sufficient to sustain federal FCA and AKS claims and succinctly recited many of Relator's detailed allegations demonstrating those schemes. Order at 2-16. [Dkt. No. 56.]

In granting Abbott's prior motion to dismiss Relator's State FCA Claims, the Court held that "Relator has not alleged with particularity how any false claims were submitted to each state identified in the FAC." Order at 16. [Dkt. No. 56.] The SAC now provides a clear explanation of how the MC Device is billed to the Plaintiff States via relevant CPT codes and State data demonstrating that claims for the MitraClip were, in fact, submitted to the States. *See* SAC ¶ 45, Exhibit B to SAC. In addition, the SAC provides specific, representative examples of implanting physicians who were targeted and paid remuneration by Abbott and were reimbursed by the Plaintiff States for implanting the MC Device on covered beneficiaries during the relevant period. *Id.* ¶ 163, 170(a)-(d), 170(j)-(u); Exhibit B to SAC.

### C. Abbott Employs Kickback Schemes in Every Plaintiff State

Relator has first-hand knowledge of the kickback tactics Abbott used nationwide to induce doctors and hospitals to refer patients and implant them with Abbott's MitraClip Device. *See, e.g.,* SAC ¶¶ 5, 150, 154, 170. The SAC provides a representative sample of state false claims analogous to federal false claims in Exhibit A based on Abbott's payments and the State Medicaid payments to those physicians for TMVR procedures. *See* Exhibit B to SAC.[4] Relator alleges that

---

[4]Abbott squabbles over whether certain data referenced in the SAC is publicly available, implying that Relator's inclusion of such data makes "a mockery of false

these physicians, who were targeted by Abbott's kickback scheme, received remuneration from Abbott in the form of speaker honorariums, consulting fees, food and beverages, research funding, as well as state money for performing procedures implanting Abbott's MC Device. *Id.* These physicians include Dr. M.P. (reimbursed $11,597.12 from California's Medicaid program, MediCal, for the TMVR procedure) and Dr. D.S. (reimbursed $5,265.94 from MediCal for the TMVR procedure), both examples were pled in the FAC that the Court analyzed in its Order with respect to the federal reimbursements. Order at 4-6, 10-14.

To further connect Abbott's scheme to state Medicaid payments, the SAC provides detailed exemplars of physicians whom Abbott targeted and provided remuneration, how they were targeted, and how much State Medicaid money each received in reimbursement for performing TMVR procedures with Abbott's MC Device. SAC ¶ 163. These exemplars include:

- Dr. S.K., who was the top MitraClip implanting physician in the world and who Relator was assigned to keep happy. SAC ¶ 163(a). From 2015 to 2021, Abbott's payments to Dr. S.K. exceeded $1 million ($1,404,280.64), and from 2013-2020, the State of California ("MediCal") reimbursed Dr. S.K. $23,412.22 for the TMVR implanting procedure for MediCal-covered cardiac patient beneficiaries. *Id.*

- Dr. C.R., who was honored by Abbott at a reception in 2017 and was paid more than $250,000 by Abbott from 2015 to 2021, was reimbursed by the State of California (MediCal) over $12,000.00 for

claims acts[.]" Memo, at 3, 6, 13-14, 16. Inclusion of publicly available data is proper here because Relator's own personal knowledge is essential to its conclusion that a fraud had been committed. *See, generally*, *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F. 3d 645 (D.C. Cir. 1994).

performing the TMVR procedure on state healthcare program funded cardiac patients from 2013 to 2020. SAC ¶ 163(b).

- Dr. J.R., a Florida physician who was invited to speak at Abbott's Annual TMVR Summit in 2017 and was paid over $270,000 by Abbott between 2015 and 2021. SAC ¶ 163(c). The State of Florida Medicaid program reimbursed Dr. J.R. nearly $5,000 from 2013 to 2020 for the TMVR procedure performed on state-funded cardiac patients. *Id.*

- Dr. R.Q., who was targeted by Abbott sales representatives for patient-practice building, SAC ¶ 163(d), and received more than $300,000 in payments from Abbott from 2015 to 2021, and nearly $14,000 from the State of Florida Medicaid program from 2013 to 2021 for performing the TMVR procedure. *Id.*

- Dr. G.T., who garnered referrals from Abbott's practice-building scheme in New York. SAC ¶ 163(e). From 2015 to 2021, Abbott made payments to Dr. G.T. exceeding $200,000, and from 2013 to 2020, the State of New York Medicaid program reimbursed Dr. G. T. nearly $5,000 for performing the TMVR procedure. *Id.*

- Dr. S.K., for whom Abbott hosted a free reception and speaker program on April 11, 2016, with the opportunity to meet referring physicians in Connecticut. SAC ¶ 163(f). From 2015-2021, Abbott made payments to Dr. S.K. that exceeded $186,000, and from 2013 to 2020, the State of New York Medicaid program reimbursed Dr. S.K. nearly $12,000 for implementing the TMVR procedure. *Id.*

- Dr. N.P. and Dr. C.K., who were provided a cocktail reception and dinner program in New York by Abbott. SAC ¶ 163(g). Abbott also created referral templates for Dr. C.K., making them appear to be the

hospital's stationary, rather than an Abbott template, for referring physicians. *Id.* Abbott paid Dr. C.K. over $52,000 from 2015-2021 and the New York State Medicaid program reimbursed Dr. C.K. over $7,000 from 2013 to 2020 for performing the TMVR procedure. *Id.*

- Dr. V.R., a Georgia implanting physician, was invited by Abbott to speak to its national sales force in Denver on the theme of "owning the customer." SAC ¶ 163(h). From 2015-2021, Dr. V.R. received monetary payments from Abbott exceeding $270,000 and from 2013 to 2020, he was reimbursed by the State of Georgia over $4,000 for performing the TMVR procedure on cardiac patients covered by that state's healthcare program. *Id.*

The fact that Abbott's fraudulent tactics are widespread is not surprising because its MC Device marketing scheme is conducted nationwide. For example, in August 2015, Relator attended an initial training session for Abbott's new hires. SAC ¶ 150. This training included sales representatives who were tasked with marketing the MC Device to physicians and hospitals in Arizona, California, Connecticut, Florida, Indiana, New York, and Ohio. *Id.* All of the new hires, including Relator, were instructed to convince implanting physicians in each of their assigned states that they had "an ideal opportunity to build their patient base from Abbott's referral physicians." *Id.* The new hires also received instructions for using the national database for referral physician activity and tracking the return on investment for their referral activities. *Id.* The National Director for Structural Heart Marketing, Tiffany Liu, followed up with each of the new hires in a uniform fashion. *Id.* In April 2016, Abbott hosted a National Summit in Chicago with the theme of "best practices" for how to effectively target and drive patient referrals from all potential referral sources to implanting physicians and measuring the return

on investment. *Id.,* ¶ 151.  Abbott employees in attendance were tasked with marketing MitraClip to physicians and hospitals across the country, including in Arizona, Georgia, Illinois, Louisiana, Minnesota, Pennsylvania, Texas, California, Hawaii, and Washington State.  *Id.*

As an additional demonstration of the uniformity of Abbott's nationwide marketing, the SAC includes a quote from Abbott's President and CEO, Robert B. Ford, from its First Quarter 2021 Earnings Call, wherein he stated, ". . . we're making our investments not only on the pipeline side, new versions of MitraClip, ***but also more importantly in the market development, so really to expand the funnel of patients being treated, creating those patient referral networks with the cardiologists on our implanting center. So that's done very well.***"  SAC ¶ 148 (emphasis added).  Mr. Ford's statement echoes the training pitch used by Abbott's National Sales Director, Jeff Roach, who would carry a large red funnel to sales meetings and repeat the phrase, "fill and empty the funnel" tirelessly to instruct Abbott's sales and marketing team nationwide how to promote the MC Device. SAC ¶ 167.  The  statement also mirrors the language used by Relator's direct supervisor, Michael Meadors, who sent emails instructing his team that "[i]t's all about 'filling' and 'emptying.' The schematic [funnel diagram] just to the right of our boss [Roach holding the red funnel] is what we, as a management group, believe is fundamental to our short and long-term success," and Abbott's expectation of his team was that its members "leverage their individual strengths all while keeping to the organizational direction of 'funnel filling and funnel emptying.'"  SAC ¶ 168.  Together, these facts demonstrate how  Abbott's MC marketing messaging was uniformly disseminated throughout the Plaintiff States.

## III.    THE COURT SHOULD DENY ABBOTT'S MOTION

### A.    Standard of Review.

In order to avoid dismissal, a complaint must be "plausible on its face[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a complaint states a plausible claim for relief, the court must "draw on [its] judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and consider "'obvious alternative explanation[s].'" *Id.* at 682. A motion to dismiss a complaint or claim based on an anti-fraud statute under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). The complaint meets the heightened pleading requirements of Rule 9(b) when the circumstances constituting fraud, *i.e.*, the "who, what, when, where, and how of the misconduct charged" are alleged with particularity. *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). However, "[t]he 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b).'" *Andresen v. Int'l Paper Co.*, 2014 WL 2511283, at *5 (C.D. Cal. June 3, 2014) (citation omitted). "Rather, the rule is context specific and flexible." *Id.* It is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *Ebeid*, 616 F.3d at 998-999. All factual allegations set forth in the complaint "are taken as true and construed in the light most favorable to [p]laintiffs." *Epstein v. Washington Energy Co.,* 83 F.3d 1136, 1140 (9th Cir. 1996).

In this Circuit, courts have acknowledged that once a complaint satisfies the plausibility inquiry, "no more is required." *United States v. Medtronic PLC*, No. 217CV01903ODWSSX, 2022 WL 541604, at *5 (C.D. Cal. Feb. 23, 2022). The Ninth Circuit has expressly noted that a plaintiff "need not[] provide representative examples to establish the payment element of the prima facie case." *Ebeid*, 616 F.3d at 998-999. Lastly, courts are generally more lenient at the pleading stage,

when, defendants are alleged to have induced third parties to submit false claims, as the relator "cannot reasonably be expected to allege details about the individual claims that were submitted." *U.S. ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at, *9 (C.D. Cal. July 10, 2014) (citing *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.,* 579 F.3d 13, 29 (1st Cir. 2009)). As set forth below, the SAC thoroughly meets the requisite pleading standards, making dismissal of the state law FCA claims unwarranted.

**B.      Abbott Employed the Same Fraudulent Schemes to Defraud Both the Federal and the State Governments.**

Relator's SAC alleges that Defendants' national kickback schemes induced physicians and hospitals to use the MC Device in medical procedures covered by Medicare, Medicaid, and the Plaintiff States' healthcare programs. *See* Dkt. 57, SAC ¶¶ 2-3. Medicaid is jointly funded by the United States and state governments under a federal matching program. *Id.* ¶ 32.[5] As a result, when a claim under the federal FCA asserts that a company has made false statements in order to receive Medicaid reimbursement, those Medicaid dollars include both state and federal funds. As long as Relator's State FCA Claims plead that state funds were used, as is the case in the SAC, the underlying claim of fraud is the same, and both federal and state FCA claims are properly asserted. The Court has already held that Relator has sufficiently alleged a nationwide scheme to defraud the Government under the FCA. Order at 11-16. Those same allegations properly plead Relator's State FCA Claims as well, because they are a subset of the Relator's federal FCA Claims. Abbott thus has the requisite notice of Relator's claims under Rule 9(b) sufficient to

---

[5] See, e.g., https://www.federalregister.gov/documents/2020/11/30/2020-26387/federal-financial-participation-in-state-assistance-expenditures-federal-matching-shares-for (explaining the formulas used by the U.S. Department of Health and Human Services to determine the amount of federal matching for Medicaid).

survive a motion to dismiss. Its arguments to the contrary are unconvincing.

Relator alleges that Abbott defrauded State healthcare programs using the same schemes that it uses to defraud the federal government healthcare program. *See*, *e.g.*, Dkt. 57, SAC ¶¶ 215-217, 228-231. Because Relator alleges specific facts regarding fraud committed under the state laws and provides particularized allegations of how claims were submitted to each state, the State FCA Claims must survive. *See United States v. N. Am. Health Care, Inc.*, 173 F. Supp. 3d 943, 952–53 (N.D. Cal. 2016). Contrary to Abbott's contentions, Relator does not argue that the Court can simply infer state FCA claims based on his/her federal FCA claims. *See U.S. ex rel. Chin v. CVS Pharmacy, Inc.*, No. 09-cv-1293, 2017 WL 4174416, at *8-9 (C.D. Cal. Aug. 15, 2017); Memo at 8. Instead, Relator asserts that Abbott simultaneously violates the Federal FCA and state FCAs by means of one fraudulent scheme.

In *North American Health Care*, in circumstances similar to this case, the court sustained the relator's federal FCA claims, but dismissed the state law FCA claims arising under California and Washington state law with leave to amend. *Id*. Thereafter, the relator filed a third amended complaint, adding the following paragraph:

> Because state Medicaid programs operate in conjunction with Medicare, Defendants defrauded California when they defrauded the United States. For example, after the twentieth day of a stay at a skilled nursing facility covered by Medicare, a patient's co-insurance becomes partially responsible for paying the bill. For Medi-Cal-qualifying patients, Medi-Cal acts as the co-insurance. Therefore, when Defendants conducted their fraudulent scheme to regenerate residents' Medicare reimbursement, they also defrauded the state Medi-Cal programs.

*Id*. When faced with a renewed motion to dismiss, the court held that the addition of this single allegation was sufficient to allege a California state law FCA

claim because it explained "how California's Medicaid program would be defrauded in the same way as the Medicare program is . . ." *Id*.

This Court has already determined that Relator sufficiently alleged fraud under the federal FCA. *See* Order, generally. And, as in *North American Health Care*, Relator alleges violations of state law FCA claims based on the same exact fraudulent scheme that Abbott uses to violate the federal FCA. *See* SAC ¶¶ 234, 244, 254, 264, 274, 284, 293, 303, 313, 323, 333, 343, 353, 363, 373, 383, 393, 403, 414, 424, 434, 443, 458, 468, 478, 488.

Moreover, and importantly, the state law FCA allegations in Relator's SAC are much more specific and numerous than the minimal state FCA allegation in *North American Health Care*, and certainly go beyond adding "conclusory labels of a 'nationwide' scheme," via "cosmetic tweaks" to the Complaint, as Defendants falsely assert. *See* Memo at 7-10. For example, Exhibit B to the SAC provides a representative sample of state false claims based on Abbott's payments to 70 implanting physicians identified by Relator as targets of Abbott's kickback schemes along with the State Medicaid payments to each physician for TMVR procedures using Abbott's MitraClip Device. SAC ¶ 182.

To determine how Relator alleges that Abbott's scheme defrauds the federal government and the States' governments simultaneously, the Court can scrutinize the allegations regarding the physicians Abbott targeted and provided remuneration. For example, the Court determined that in the FAC, Relator sufficiently pleaded a fraudulent scheme based in part on its description of Abbott's relationship with Dr. M.P., a physician that Relator was instructed to target with Abbott's kickback schemes. Order at 10, 12-14, 16. In Exhibit A to the SAC, Relator demonstrated that between 2016 and 2018, Dr. M.P. received $149,497.79 in payments from Abbott and an estimated $179,384.44 in payments from the federal Medicare

program for performing the TMVR procedure.  *See also* Order at 5.  In Exhibit B to the SAC, Relator demonstrates that Dr. M.P. *also* received $11,597.12 from California's Medicaid program, MediCal, for performing the TMVR procedure between 2013 and 2020.  The exact same fraudulent scheme, wherein Relator was instructed to engage in practice-building for Dr. M.P. by hosting primarily social meal events for Dr. M.P. and his/her referring physicians, resulted in payments to Dr. M.P. from both the Government ***and*** the State of California for Dr. M.P.'s performance of the TMVR medical procedure, using the MC Device.  *See* SAC ¶¶ 170, 173-177, Exhibit A, Exhibit B.

Thus, Relator's SAC not only adequately alleges that Abbott "provides services to patients who receive state funds," it also sufficiently links the state Medicaid funds to Abbott's fraud.  *See* Memo at 15 (quoting *Foglia v. Renal Ventures Mgmt, LLC*, 830 F. Supp. 2d 8, 22 (D.NJ. 2011)).  *Foglia* is distinguishable from the instant case because the relator there not only failed to plead federal FCA claims, but also failed to allege that the defendant submitted claims for reimbursement by state payors.  *Foglia*, 830 F. Supp. 2d at 23.

Relator's SAC additionally alleges that Abbott's management directed sales representatives throughout the country to engage in the same kickback schemes that Relator was instructed to employ.  *See* SAC ¶¶ 150-151, 167-168.  In contrast to Defendants' assertions, Relator does not merely make "blanket allegations of a nationwide scheme" to support the SAC's state FCA claims.  Memo at 1, 9 (quoting *United States v. Medtronic, Inc.*, No. 15-6265, 2017 WL 2653568, at *5 (E.D. Pa. June 19, 2017)).  The amended complaint at issue in *Medtronic*, 2017 WL 2653568, "[did] not . . . reference any actual claims, services, providers, or conduct located outside of Pennsylvania," and therefore could not meet the particularity requirement of Rule 9(b).  *Medtronic*, 2017 WL 2653568, at *5.  *Medtronic* is readily

distinguishable from the instant case because Relator has supplied the Court with ample details regarding claims, services, providers, and conduct located in states throughout the country. *See, e.g.*, SAC ¶ 163, Exhibit B. The *Medtronic* court further explains that, "[i]n cases in which relators have alleged enough to sustain claims under state false claims statutes, the complaints have contained more facts that could raise the inference that the defendants' conduct occurred nationwide." *Medtronic*, 2017 WL 2653568, at *5. In contrast to the relator in *Medtronic*, the *Medtronic* court discusses *United States v. Executive. Health Resources., Inc.*, 196 F. Supp. 3d 477, 494 (E.D. Pa. 2016), where "the relator sufficiently alleged a nationwide scheme because although the relator did not plead specific facts in every state, he alleged that dozens of specific hospitals around the country were the defendant's clients and that the defendant provided specific services for over half of country's hospitals." *Medtronic*, 2017 WL 2653568, at *5. Here, like in *Executive Health Resources*, Relator has pleaded specific facts regarding more than 70 physicians across the Plaintiff States, including that each of the physicians listed in Exhibit B were targeted by Abbott's kickback schemes, received money from Abbott, and received money from the States for performing TMVR procedures on patients covered by State Medicaid programs. *See* Exhibit B to the SAC. The SAC describes in detail how Abbott targeted an illustrative sample of nine physicians from multiple states. SAC ¶ 163. Eight of these nine doctors, the implanting physicians described in SAC ¶ 163, appear in Exhibit B among the larger group of representative physicians because they each received State Medicaid payments for performing TMVR procedures.

Defendants argue that allegations of a nationwide scheme are never sufficient to meet the Rule 9(b) pleading requirements for state FCA claims. *See* Memo at 9. This is not true. When relators sufficiently plead a nationwide fraudulent scheme,

courts decline to dismiss state FCA claims.  *See U.S. ex rel. Carpenter v. Abbott Labs., Inc.*, 723 F. Supp. 2d 395, 409 (D. Mass. 2010) (the relator pleaded with sufficient detail its allegations as to false claims in Massachusetts, and it was those specifically pleaded allegations that supported its inference of a nationwide scheme and thus its state-law claims elsewhere); *U.S. ex rel. King v. Solvay S.A.*, 823 F. Supp. 2d 472 (S.D. Tex. 2011) (the court declined to dismiss state law claims predicated on the same theories as federal claims because, although the relator's kickback allegations were all from Texas, the relator "alleged enough details of a geographically diverse kickback scheme to reliably indicate that there was a nationwide kickback scheme"); *United States ex rel. Rahimi v. Zydus Pharms*. (USA), Inc., No. CV 15-6536-BRM-DEA, 2017 WL 1503986, at *13 (D.N.J. Apr. 26, 2017), *on reconsideration in part sub nom*. *Rahimi v. Zydus Pharms.* (USA) Inc., No. CV 15-6536-BRM-DEA, 2018 WL 515943 (D.N.J. Jan. 23, 2018) (declining to dismiss state FCA claims because the relators' FAC included "several examples of pricing disparities between Medicaid reimbursement and wholesale pricing from wholesalers providing services to retail pharmacies across the nation," sufficiently alleging a nationwide scheme).  As is true here, Relator makes both federal and state allegations based on the same fraudulent scheme.

All of the cases Defendants cite in support of this argument are actually cases in which relators failed to sufficiently plead that fraud had occurred nationwide, and/or did not otherwise sufficiently plead state FCA claims, requiring dismissal of the state FCA claims.  *See* Memo at 9.  In *U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 357 (D. Mass. 2011), the court determined that because the relator had not pleaded specific claims as to ***any*** state, it could not infer a nationwide scheme and had to dismiss the state FCA claims.  The *Nowak* court noted, "Although one judge in this District has found that specifically pled claims in

one state are sufficient to support an inference of a nationwide scheme and the pleadings requirements for all state counts, [], no such specific claims have been pled here as to *any* state." *Id.* (emphasis in original) (citing *Carpenter v. Abbott Labs., Inc.*, 723 F. Supp. 2d at 409 (allowing suit to "proceed on a nationwide basis where specific facts are alleged involving a single representative state.")). Here, unlike in *Nowak*, the SAC sufficiently demonstrates that state money was paid for procedures involving the MitraClip performed by physicians in many states who were targeted by Abbott's kickback schemes, going far beyond the showing proffered in *Nowak*. *See* SAC ¶ 163, Exhibit B.

In *Hericks v. Lincare Inc.*, No. 07-387, 2014 WL 1225660, at *8 (E.D. Pa. Mar. 25, 2014), the relator's state law claims relied exclusively on the relator's allegation of a nationwide scheme, and the allegation of a nationwide scheme was based exclusively on one comment from a company supervisor during one training session, informing the relator that the company "used a 'cookie cutter' approach to marketing." 2014 WL 1225660, at *8. The *Hericks* court determined that this statement, without more, did not support the relator's assertion that the company was engaged in fraudulent activity in every company location. *Id.* Here, as described above, the SAC provides this Court with much more information about Abbott's uniform nationwide practices than did the relator in *Hericks*.

In *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1277 (N.D. Ga. 2012), the relator could not sufficiently allege a nationwide fraudulent billing practice where his firsthand knowledge was only derived from reports and directives from the company's national office and his work in Los Angeles and Nevada. Here, on the other hand, Relator's knowledge of Abbott's nationwide scheme is based on his/her participation in national meetings and conferences, interactions with Abbott management, and involvement in the

practice-building efforts at Abbott's behest.  *See* SAC ¶¶ 150-155, 163, 182.  The *Saldivar* court additionally recognized that if the relator had not failed to comply with each state's procedural requirements, the relator would have sufficiently alleged violations of California and Nevada's FCA laws.  *Id*.

In *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709 (N.D. Tex. 2011), the court dismissed the Texas-based relator's Massachusetts, Nevada, and New Mexico FCA claims (without prejudice) because the court found that general allegations made "upon information and belief" were insufficient to infer that fraud occurred in other states.  *Id*. at 723.  Indeed, the relator failed to "set forth in the complaint the facts supporting the belief."  *Id*.  Here, Relator sets forth the bases for his/her beliefs throughout the SAC.  The relator's Indiana and Texas FCA claims were dismissed because the laws did not apply retroactively.  *Id*. at 723-24.

In *U.S. ex rel. Academy Health Center, Inc. v. Hyperion Foundation, Inc.*, No. 10-cv-552, 2014 WL 3385189, at *33 (S.D. Miss. July 9, 2014) the court dismissed barebones "allegations regarding a nationwide pattern of conduct" where the only allegation concerning other states disclosed that events at one location were "not an isolated occurrence."  Memo at 9.  As described above, however, the SAC in the instant case alleges significant facts to demonstrate that Abbott's fraudulent activity took place in all of the Plaintiff States.  *See, e.g.*, SAC ¶¶ 163, 170, 182, Exhibits A and B.

None of Abbott's other authorities are applicable here.  *See Hart v. Publicis Touchpoint Sols., Inc.*, 821 F. App'x 557 (6th Cir. 2020) (affirming summary judgment involving unlawful termination claims); *United States ex rel. Kroening v. Forest Pharms., Inc.*, 155 F. Supp. 3d 882, 895–97 (E.D. Wis. 2016) (relator failed to plead any false claims and relied on "purported hearsay"); *U.S. ex rel. Buth v. Walmart, Inc.* No. 18-cv-840, 2019 WL 3802651, at *7 (E.D. Wis. Aug. 13, 2019)

(finding six examples from one Wisconsin pharmacy insufficient to support an inference of nationwide misconduct); *Health Choice Group, LLC v. Bayer Corp.* No. 17-cv-126, 2018 WL 3637381, at *45 (E.D. Tex. June 29, 2018) (no scheme to submit false claims alleged); *U.S. ex rel. Solis v. Millennium Pharm., Inc.*, 445 F. Supp. 3d 786, 800 (E.D. Cal. 2020) (finding no indicia which could give rise to a strong inference that claims were submitted); *U.S. ex rel. Harris v. Alan Ritchey, Inc.*, No. C00-2191Z, 2006 WL 3761339, at *6 (W.D. Wash. Dec. 20, 2006) (relator alleged no details, individuals, or specific information relating to other locations); *United States v. Novartis Pharmaceutical Corp.,* No. 13-cv-3700, 2022 WL 4217749, at *4 (S.D.N.Y. Sept. 13, 2022) (plaintiff failed to plead any false claims and gave no explanation as to why certain interactions amounted to improper inducement).

The case law overwhelmingly supports the conclusion that Relator's State FCA Claims are well plead. The SAC alleges specific facts regarding Abbott's fraud committed under the state laws, and provides particularized allegations of how the false claims were submitted to each Plaintiff State. Relator's State FCA Claims are proper and should not be dismissed.

### C. The SAC Sufficiently Alleges State FCA Violations.

As discussed, the FAC alleged that the claims the Court found sufficient for the federal claims are also sufficient for the State claims. The SAC now alleges "some specificity with respect to each asserted state," and does not "rely upon generalized pleadings." Order at 16 (citing *Nowak*, 806 F.Supp.2d at 357). In its Order, the Court stated, "Relator has not alleged with particularity how *any* false claims were submitted to each state identified in the FAC." Order at 16 (emphasis added). The SAC provides ample facts that demonstrate how false claims were submitted to the States. For example, the SAC identifies approximately 70

physicians from the various Plaintiff States that Abbott targeted and provided remuneration as a part of the same fraudulent schemes that violate the federal FCA and who received reimbursement from the specific States for performing the TMVR procedure on covered beneficiaries. *See* Exhibit "B" to the SAC. Additionally, the SAC provides details regarding how Abbott targeted and provided remuneration to a representative sample of nine physicians in multiple states, and how those physicians received reimbursement from the physicians' State Medicaid programs. SAC ¶ 163.

In addition, the SAC contains detailed allegations regarding how Relator was instructed and required to continually drive referrals to California's Dr. S.K., how Abbott's payments to Dr. S.K. exceeded $1 million ($1,404,280.64) between 2015 and 2021, and how the State of California (MediCal) reimbursed Dr. S.K. $23,412.22 for the MitraClip implanting procedure between 2013 and 2020. SAC ¶ 163(a). The SAC also alleges details regarding how Abbott hosted a sham MitraClip marketing reception at El Camino Hospital on February 28, 2017 for Dr. C.R. in California, how that doctor was paid over $250,000 by Abbott from 2015 to 2021, and how the State of California (MediCal) reimbursed Dr. C.R. more than $12,000 for the MitraClip TMVR implanting procedure between 2013 and 2020. SAC ¶ 163(b). In addition, the SAC provides details of how Abbott's management, including Michael Meadors, (a) targeted Florida's Dr. J.R. for patient practice-building, SAC ¶ 163(c); (b) how Dr. J.R. was invited to speak at Abbott's Annual TMVR Summit in 2017 as a quid pro quo for his commitment to the MitraClip Device; (c) how Abbott paid Dr. J.R. over $270,000 between 2015 and 2021; and (d) how the State of Florida Medicaid program reimbursed Dr. J.R. nearly $5,000 from 2013 to 2020 for performing the MitraClip TMVR implanting procedure. *Id*. The SAC's allegations also provide details how Dr. R.Q. was targeted by Abbott's

patient-practice building scheme by Abbott sales representatives Michelle Butler and Scott Reynolds and their manager, Frank Sobczak. SAC ¶ 163(d). The SAC details how Mr. Sobczak instructed Ms. Butler and Mr. Reynolds to target Internal Medicine physicians for referrals to MitraClip targeted implanters. *Id*. Abbott paid Dr. R.Q. over $300,000 between 2015 and 2021, and the State of Florida Medicaid program reimbursed Dr. R.Q. nearly $14,000.00 for performing the MC TMVR procedure on State-funded cardiac patient beneficiaries. *Id*. The SAC further describes how Abbott's sales representative, Linda Morgan, grew targeted implanting physician Dr. G.T.'s patient base by planning an "Over 55 Community Event," at various medical facilities where Dr. G.T. could meet prospective patients and referring physicians. SAC ¶ 163(e). Ms. Morgan also scheduled dates for Dr. G.T. to attend Grand Rounds at neighboring hospitals for potential patient referrals. *Id*. From 2015 to 2021, Abbott made payments to Dr. G.T. exceeding $200,000.00, and from 2013 to 2020 the State of New York Medicaid program reimbursed Dr. G.T. nearly $5,000.00 for performing the MitraClip procedure. SAC ¶ 163(e). The SAC also describes how Abbott organized a free sham reception and speaker program for New York's Dr. S.K. on April 11, 2016 to meet referring physicians at the trendy Barcelona Wine Bar in Stamford, Connecticut. SAC ¶ 163(f). From 2015-2021, Abbott made payments to Dr. S.K. that exceeded $186,000.00, and from 2013 to 2020, the State of New York Medicaid program reimbursed Dr. S.K. nearly $12,000.00 for the MitraClip TMVR procedure. *Id*. The SAC also alleges how Abbott organized a cocktail reception and dinner program for Dr. N.P. and Dr. C.K. on April 12, 2016 at the Amali Restaurant in New York, which included a sham speaker program. SAC ¶ 163(g). Abbott additionally created a generic letter template for Dr. C.K., that included the doctor's hospital logo, making it appear as if the letter was coming from the hospital instead of Abbott, directed to referral

physicians.  *Id.*  Abbott paid Dr. C.K. over $52,000.00 from 2015 to 2021 and the New York State Medicaid program reimbursed Dr. C.K. over $7,000.00 from 2013 to 2020 for performing the MitraClip TMVR procedure.  The SAC also describes how Abbott invited Georgia implanting physician, Dr. V.R., to speak at its National Sales Meeting in Denver.  SAC ¶ 163(h).  From 2015 to 2021, Dr. V.R. received monetary payments from Abbott exceeding $270,000.00 and from 2013 to 2020, he was reimbursed by the State of Georgia over $4,000.00 for performing the MitraClip TMVR procedure.  *Id.*

Relator did not "scrounge[] up merely eight isolated examples of alleged practice-building activity in four States[,]" as Defendants argue.  Memo at 13. Rather, Defendants fail to acknowledge that when alleging a nationwide scheme, Relator is not required to plead each and every instance of fraudulent conduct. *United States ex rel. Chin v. CVS Pharmacy, Inc.*, 2017 WL 4174416, at *7 (C.D. Cal. Aug. 15, 2017).  Additionally, Defendants fail entirely to acknowledge that the facts alleged in Exhibit B to the SAC, concerning 70 physicians from across the United States, constitute additional allegations of fraud.  Relator's detailed allegations specify the "who, what, when, where, and how" of Abbott's "practice building" scheme, and are more than sufficient to meet Rule 9(b).  *See, e.g.*, *Brown*, 2014 WL 3605896, at *9 ("as a direct participant in Celgene's off-label promotion, Brown 'sets out the particular workings of a scheme that was communicated directly to [her] by those perpetrating the fraud'"); *U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 516 (S.D.N.Y. 2014) (the allegations "describe specific examples of alleged sham speaker events, as well as specific doctors who were repeat speakers or attendees"); *United States v. N. Am. Health Care, Inc.*, 2015 WL 6871781, at *6 (N.D. Cal. Nov. 9, 2015) (relator's description of scheme through "first-hand information" sufficient).

Defendants further argue that Relator's allegations do not suggest wrongdoing as opposed to legitimate educational and marketing activity. Memo at 14.[6] Defendants attempted this rehashed argument in their last motion to dismiss, and the Court was not persuaded. *See* Order at 12, 14-15. When considering Relator's allegations as a whole, the Court correctly determined that there is a plausible inference that the events described by Relator were arranged by Abbott to provide free advertising and marketing assistance to doctors to help grow their practices. Order at 15. This same reasoning applies to the new allegations in Relator's SAC. These events could both be "educational" and illicit, if, in addition to any education, "one purpose of the payment was to induce future referrals." *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Hong*, 938 F.3d 1040, 1048 (9th Cir. 2019) (remunerations spent on overhead expenses were still "kickbacks" under the AKS if intended to induce future referrals). Accordingly, Abbott is impermissibly asking the Court to draw unreasonable inferences in its favor in direct contradiction to the facts alleged in the SAC.

Finally, Abbott argues that Relator does not allege that Abbott paid these doctors in excess of fair market value, claiming that payment in excess of fair market value is "required to plead a kickback." Memo at 15. But this argument misses the mark as well. Relator, through the SAC, has provided particularized

---

[6] At times, Defendants' arguments go too far. For example, Abbott mischaracterizes the Court's Order by repeatedly insisting, "As this Court's prior order recognized, it is hardly improper to host events for 'educational' purposes or as 'token[s] of goodwill.'" *See, e.g.*, Memo at 2, 5, 14. [Dkt. No. 59-1]. The Order actually says: "Abbott argues that '[I]t defies common sense to conclude that a meal for a doctor as part of a business meeting—a routine industry practice—would be anything more than a 'token gesture' of goodwill, much less that the meal constitutes criminal conduct.... [t]aking Relator's allegations as true, these meal events with Dr. M.P. cannot be characterized as routine educational events or simply 'token gestures' of goodwill." Order at 12. [Dkt. No. 56].

allegations and representative exemplars of sham events.  For example, the SAC describes how Abbott grew targeted implanting physician Dr. G.T.'s patient base by planning an "Over 55 Community Event," at various medical facilities where Dr. G.T. could meet prospective patients and referring physicians (SAC ¶ 163(e)) and how Abbott hosted a sham MitraClip marketing reception at El Camino Hospital on February 28, 2017 for California Dr. C.R.  SAC ¶ 163(b).  Events such as these were organized primarily to build the practices of implanting physicians and provide them with remuneration, not to provide an education.  And, by establishing that these speaker program events were complete "shams," Relator also establishes that the honorarium paid vastly exceeded fair market value because the fair market value for sham speaker programs is zero.  *See United States v. Teva Pharm. USA, Inc.*, 2019 WL 1245656, at *15 (S.D.N.Y. Feb. 27, 2019) ("Because these programs had no legitimate purpose, except to reward or increase speaker prescriptions, any payments made to speakers for these programs would exceed 'fair market value'").[7] When viewed as a whole, the SAC clearly alleges particularized details of Abbott's scheme, along with the "reliable indicia" that lead to the strong inference that state and federal claims were actually submitted to the government.  *Ebeid*, 616 F.3d at 999.

## V.    CONCLUSION

For the reasons stated above, Abbott's Motion should be denied in its entirety.

---

[7] Abbott's cited authorities discussed paying above-market rates for actual services, not sham speaker program honoraria.  *See United States v. Adventist Health*, 2020 WL 2522114, at *7 (E.D. Cal. May 18, 2020) (management services); *U.S. ex rel. Gough v. Eastwestproto, Inc.*, No. CV 14-465, 2018 WL 6929332, at *8 (C.D. Cal. Oct. 24, 2018) (ambulance services); *United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1223 (W.D. Wash. 2011) (imaging services).

Dated: October 31, 2022

Respectfully Submitted,

/s/ *Chiharu G. Sekino*
Chiharu G. Sekino (SBN 306589)
cgsekino@millershah.com
Casey T. Yamasaki (SBN 335445)
ctyamasaki@millershah.com
MILLER SHAH LLP
1230 Columbia Street, Suite 1140
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367

James E. Miller (SBN 262553)
jemiller@millershah.com
Laurie Rubinow (*Pro Hac Vice*)
lrubinow@millershah.com
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367

Jonathan K. Tycko (*Pro Hac Vice*)
jtycko@tzlegal.com
TYCKO & ZAVAREEI, LLP
1828 L Street, NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Monique Olivier (SBN 190385)
monique@os-legal.com
Christian Schreiber (SBN 245597)
christian@os-legal.com
OLIVIER & SCHREIBER LLP
475 14th Street, Suite 250
Oakland, CA 94612
Telephone: (415) 484-0980
Facsimile: (415) 658-7758