UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al. ex rel. Everest Principals, LLC,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>ABBOTT LABORATORIES, et al.,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 20cv286-W (MSB)<br><br>**DISCOVERY ORDER**<br>**[ECF NOS. 103, 104]** |

　　　　This is a *qui tam* case, wherein Plaintiff-Relator, Everest Principals, LLC ("Relator") maintains causes of action against Defendants Abbott Laboratories, Abbott Cardiovascular Systems, Inc., Abbott Vascular, Inc., and Abbott Laboratories, Inc. (collectively "Abbott" or "Defendants") on behalf of the United States of America ("U.S.") and several states for violations of the federal False Claims Act ("FCA") and analogous state laws.  (See ECF No. 85 at 6.)  Relator's primary argument is that Defendants, who sell a cardiac device, provided illegal kickbacks to two types of physicians to induce use of Defendants' device: those who saw cardiac patients and were targeted by Defendants to make referrals to the second type ("referring physicians"), and those who performed the surgeries implanting Defendants' cardiac device ("implanting physicians").  (Id. at 87-88.)

Now pending before this Court is the parties' briefing regarding the appropriate scope for Defendants' responses to Relator's first and second sets of written discovery. (See ECF Nos. 103, 104.) The parties have disagreed since discovery began in this case about the permissible temporal and geographic scope for discovery into Relator's FCA claims. (See ECF No. 75 at 7-16 (Joint Discovery Plan).) Now that Defendants have responded to Relator's first set of written discovery requests by stating that Defendants are limiting their responses to only certain states and a limited time frame, (ECF No. 104 at 5), this dispute is ripe for resolution in some respects, as further discussed below.

After reviewing informal letter briefs lodged by the parties,[1] the Court held an informal Discovery Conference to discuss these scope issues on August 21, 2023. (ECF No. 101.) The Court indicated it would be inclined to permit nationwide discovery for the period from August 2015[2] through February 14, 2020. Following the conference, Defendants requested an opportunity for formal briefing on the issue, and the parties agreed to file contemporaneous briefs setting forth their respective positions. (See ECF No. 102.) The parties filed their briefs on September 1, 2023. (ECF Nos. 103, 104.) While the form of briefing is somewhat unconventional, the parties' requests are best characterized as Relator's motion to compel production of responsive documents within a certain scope, and Defendants' request for a protective order, limiting its need to respond with

information outside a much narrower proposed scope. For the reasons explained below, the Court permits nationwide discovery while limiting the time frame in part.

///
///

---

[1] Relator filed these informal letter briefs as exhibits to its briefing. (See ECF Nos. 104-1, 104-2.)
[2] At the informal Discovery Conference, the Court gave an indicated discovery time frame from October 23, 2015 (first date of Relator's employment and when Defendants began employing Therapy Development Specialists) to February 14, 2020 (date Relator filed the complaint). Because the Court intended to indicate a time frame beginning with Relator's employment, the Court corrects that error here by using August 2015.

## I. PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

Relator is a limited liability company whose sole member, Lisa Knott,[3] was employed by Defendants as a Therapy Development Specialist in its Structural Heart Division from August 2015 to April 2017. (See ECF No. 85 at 7; ECF No. 104 at 2.) In the operative Third Amended Complaint ("Operative Complaint"), Relator summarizes its allegations as follows: "Defendants engaged in an unlawful, systematic, and nationwide scheme of paying kickbacks to physicians and hospitals in the form of, *inter alia*, patient referrals, patient practice building, free patient marketing service, honoraria for sham speaker programs, rewards in the form of clinical trial opportunities, marketing events and consulting services, free lavish meals, and cocktail parties, to induce physicians and hospitals to use Abbott's [cardiovascular device] for medical procedures performed on cardiac patients covered by [federal and state] healthcare programs, in violation of the FCA, [Anti-Kickback Statute ("AKS")], and analogous state laws and statutes." (ECF No. 85 at 6-7.)

Relator filed an initial complaint on behalf of the U.S., twenty-six states, and the District of Columbia on February 14, 2020. (ECF No. 1.) After the U.S. reported that all named government entities declined to intervene in the litigation, (ECF Nos. 8), Defendants filed their first Motion to Dismiss on July 29, 2021, arguing Relator failed to adequately allege (1) that Defendants presented a claim, (2) causation between Defendants' purported misconduct and the submission of a false claim, (3) any illegal kickbacks, and (4) scienter as to its federal claims. (ECF No. 30.) Defendants also argued that Relator's failure to distinguish between defendants supported dismissal and the state law claims should also be dismissed. (Id.) Relator filed a First Amended Complaint ("FAC") on August 19, 2021, adding allegations and a Maryland state law claim. (ECF No. 35.) Defendants again moved to dismiss, arguing Relator failed to adequately allege

---

[3] Relator and its sole member are collectively referred to as "Relator."

1  presentment of a false claim, inducement of a false claim, causation, an illegal kickback,
2  and scienter related to the federal claims, and that the state law claims should be
3  dismissed.  (See ECF No. 45.)  The District Court found Relator's allegations sufficient for
4  its federal claims, but dismissed the state law claims for failure to allege "with
5  particularity how any false claims were submitted to each state identified in the FAC."
6  (ECF No. 56 ("First MTD Order") at 16-17.)

7  Relator filed a Second Amended Complaint ("SAC") on September 22, 2022,
8  maintaining the federal claims and state law claims on behalf of twenty-five states and
9  the District of Columbia.  (ECF No. 57.)  Defendants moved to dismiss the state law
10 claims in the SAC (counts 4 through 29), arguing Relator failed to state claims on which
11 relief could be granted because it did not plead any of the state claims with particularity.
12 (ECF No. 59 ("Second MTD").)  The District Court denied the Second MTD with respect to
13 California, Florida, Georgia, and New York, finding Relator had sufficiently pleaded FCA
14 claims in violation of those states' laws.  (ECF No. 62 ("Second MTD Order") at 4-9.)  The
15 District Court dismissed the remaining state FCA claims with prejudice for failure to
16 allege specific facts about conduct occurring in those states.  (Id. at 9-10.)  With
17 agreement from Defendants and permission from the District Court, Plaintiffs filed the
18 Operative Complaint, adding Abbott Laboratories as a separate defendant on May 23,
19 2023.[4]  (See ECF Nos. 81, 82, and 85.)

## II.   DISCUSSION

21 Through two sets of written discovery, Relator has sought nationwide discovery
22 for the period from January 1, 2013, to the present.  (ECF No. 104 at 5.[5])  In response to
23 the first set of written discovery, Defendants stated they would limit their responses to
24 "information relating to the states where Relator worked (Arizona and California) and

---

[4] The Court notes that the state law claims that the District Court dismissed with prejudice continue to appear in the Operative Complaint.  (Compare ECF No. 85 with ECF No. 62.)

[5] Where the pagination in the ECF banner of the cited document varies from the footer, the Court's pin cites refer to the ECF banner.

the states for which the Court sustained FCA analog claims (California, Florida, Georgia, and New York) from October 23, 2015 to February 28, 2017 (a portion of Relator's employment with Abbott)." (Id. at 5.) Relying on the District Court orders on Defendants' motions to dismiss and the Operative Complaint, Relator argues that its "well-pleaded claims justify" national discovery from January 1, 2013, through December 31, 2021. (Id. at 2-3.) Nevertheless, Relator is willing to settle for national discovery from August 2015 through February 14, 2020, which the Court indicated it was tentatively inclined to permit. (Id. at 3.) Relying on the various versions of Relator's complaints and a different interpretation of the District Court's orders, Defendants maintain that, at-most, Relator's allegations support discovery in Arizona, California, Florida, Georgia, and New York from October 23, 2015 to February 28, 2017. (ECF No. 103 at 2.) Defendants maintain that discovery broader than these limitations is both irrelevant and disproportional. (Id. at 4.)

**A.    Legal Standard**

The Federal Rules of Civil Procedure[6] permit parties to obtain discovery of any nonprivileged matter relevant to the parties claims and defenses and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1); see also, e.g., United States ex rel. Jacobs v. CDS, P.A., No. 4:14-cv-00301-BLW, 2016 WL 4146077, at *2 (D. Idaho Aug. 3, 2016) ("The allegations of the complaint logically shape the scope of discovery. . . ."). Factors used to determine proportionality under this standard are the importance of the issues at stake, the amount in controversy, the parties' access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden outweighs the likely benefit. Fed. R. Civ. P. 26(b)(1). District courts have broad discretion to control discovery and limit burdensome and oppressive requests.

---

[6] All future references to the Rules refer to the Federal Rules of Civil Procedure unless otherwise noted.

Fiederer v. Healing Hearts Home Care, Inc., No. 2:13-cv-1848-APG-VCF, 2014 WL 4666531, at *3 (D. Nev. Sept. 18, 2014); Fed. R. Civ. P. 26(b)(2)(C)(i).

Under Rule 37, a party may move the Court to compel disclosure of certain discovery.  Fed. R. Civ. P. 37(a)(1).  The party seeking discovery must demonstrate that the request satisfies Rule 26's relevance requirement.  See, e.g., Soto v. City of Concord, 162 F.R.D. 603, 610 (N.D. Cal. 1995).  The party resisting discovery "has the burden of clarifying, explaining, and supporting its objections." DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (citing, inter alia, Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975)).  Rule 26 permits a party to move the court for a protective order limiting the scope of discovery to protect that party from "annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1)(D). Broad, unsubstantiated allegations of harm or burden will not support the issuance of a protective order.  See, e.g., Jacobs, 2016 WL 4146077, at *2 (citing Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 475 (9th Cir. 1992)).

**B.    Significance of District Court's Orders**

Both parties argue that the District Court's orders on Defendants' Motions to Dismiss support their positions regarding the scope of Relator's federal claims.  The Court addresses the arguments in turn.

First, Relator contends the District Court acknowledged an adequately alleged nationwide scheme in the First MTD Order by allowing Relator's federal claims, which purported to be nationwide, to proceed without limitation while dismissing the accompanying state claims with leave to amend.  (ECF No. 104 at 2, 7-8.)  Defendants contend the First MTD Order did not "in any way indicate that Relator had included well-pleaded allegations amounting to a nationwide scheme," but simply "did not dismiss [the federal claims] on the pleadings."  (ECF No. 103 at 2.)  Defendants argue the District Court could not have approved nationwide federal claims because the only allegations the District Court relied on to deny Defendants' Motion to Dismiss the federal claims related to physicians and events in California or Arizona.  (Id. at 7 (citing

ECF No. 56).) According to Defendants, Relator did not even mention a nationwide scheme prior to the SAC. (Id. at 3.) Defendants emphasize that one can "violate a *federal* FCA in one hospital in a single city—but that does not mean the defendant's conduct occurred *nationwide*." (Id. at 3 (emphasis in original).)

The Court agrees with Defendants that, by permitting the Relator's federal claims to proceed, the First MTD Order did not address whether Relator adequately alleged nationwide violations of the federal FCA or claims for a certain duration. Defendants' First MTD did not require the District Court to limit the scope of Relator's claim. (See ECF No. 45.) Instead, Defendants argued that Relator failed to state any claim at all. (ECF No. 45-1 at 13-31.) In refusing to dismiss the federal claims pursuant to Rule 12(b)(6), the District Court simply determined whether Relator alleged sufficient facts to cross the threshold of stating a plausible claim. (ECF No. 56 at 7-16; see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)) ("To survive a motion to dismiss, allegations in a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). To resolve this limited question, the District Court did not need to identify every fact relevant to or define the scope of Relator's federal claims. Nor did it— instead, the Court found Relator sufficiently pled "that false claims were actually submitted," "a link between the kickback and the claim for reimbursement," causation, "details of these allegedly fraudulent practice-building events," and scienter, without making any specific finding that Relator adequately alleged a nationwide scheme. (ECF No. 56 at 11-16.) And a relator may state claims under the federal FCA based on a single facility's submissions to Medicare, (see, e.g., Fiederer, 2014 WL 4666531, at *5-*6 (relator alleged both federal and Nevada state law FCA claims based on allegations related to one office's billing practices)), or based on a larger scheme in multiple states, (see, e.g., United States ex rel. Spay v. CVS Caremark Corp., 913 F.Supp.2d 125, 176 (E.D. Penn. 2012) (relator alleged nationwide federal FCA claim and specified violations in facilities in Puerto Rico, Florida, Illinois, New York, and Pennsylvania).

But like the District Court did not explicitly endorse a nationwide claim, neither did it foreclose one.  The Second MTD Order, which dismissed all except four state law claims with prejudice, did not effectively limit the federal claims.  (See ECF No. 103 at 3, 8.)  The District Court demonstrated that pleading requirements for state law claims are distinct from those for federal claims by dismissing every state law claim as insufficiently pled, including those brought under California, Arizona, Florida, and New York, while simultaneously permitting the federal claims to proceed.  (See, generally, ECF No. 56.)  The District Court specified that while Relator had sufficiently alleged its federal claims, the state law claims required that Relator "allege[] with particularity how any false claims were submitted to each state identified in the FAC."  (Id. at 16 (emphasis added).)  When later finding Relator had successfully pleaded state law claims in four states, the District Court addressed each state separately to assess whether Relator alleged "specific facts about conduct occurring in these states." (ECF No. 62 at 9.)  The Court cannot conclude based on the briefing and rulings on the MTDs that because the District Court only permitted Relator's state law claims to proceed against four states, the federal claims are similarly limited to those states.

Both MTD Orders were tailored to the issues raised in Defendants' Motions to Dismiss—whether Relator's pleadings met specific threshold requirements.  The District Court simply identified a sufficient quantum of factual allegations to permit the surviving causes of action to proceed, without addressing the scope of the federal claims.  Therefore, the Court will analyze the allegations in the pleadings to determine the scope of Relator's federal claims for discovery purposes.

C.   **Scope of Allegations in the Operative Complaint**

The parties agree that "discovery must be tethered to the claims and defenses asserted in a particular action." (See ECF No. 104 (Relator agreeing with Defendants' similar statement); ECF No. 103 at 5 (arguing discovery may not exceed Relator's well-pleaded facts.).)  The unresolved issues presented here are whether Relator's allegations regarding a nationwide practice are specific enough to satisfy Rule 9(b)'s

8

pleading requirements, and if so, for how long.  Relator frequently cites to the Operative Complaint to demonstrate that Relator seeks discovery consistent with the scope of the pleadings.  (See, e.g., ECF No. 104 at 3-4.)  Though they note changes in the allegations throughout the successive complaints to support their interpretation of the District Court's orders, Defendants also primarily frame their arguments in terms of the Operative Complaint.  (See ECF No. 103 at 8-11.)  Since Defendants have not moved to dismiss any allegations in the Operative Complaint, (see Docket), nor explicitly argued otherwise, the Court will consider the Operative Complaint.  See also Lacey v. Maricopa Cnty., 693 F.3d 896, 927 (9th Cir. 2012) ("[T]he general rule is that an amended complaint supercedes [sic] the original complaint and renders it without legal effect."); United States v. Medtronic PLC, Case No. 2:17-cv-01903-ODW (SSx), 2022 WL 541604, at *4 (C.D. Cal. Feb. 23, 2022) ("This Court finds it appropriate to conduct an analysis of the TAC from the ground up, unbound by any prior legal determinations made in connection with a now-inoperative pleading.").

      Rule 9(b) requires that allegations of fraud or mistake be pled with particularity, while conditions of a person's mind may be generally alleged.  Fed. R. Civ. P. 26(b).  This requirement applies to Relator's claims in this case. (See ECF No. 56 at 8.)  The FCA encourages insiders to disclose fraud against the government through a *qui tam* provision that permits private individuals (known as "relators") to bring civil actions on the government's behalf and retain a portion of any award.  Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 995 (9th Cir. 2010).  "To state an FCA claim, a relator must allege with particularity: '(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'"  (ECF No. 56 at 9 (quoting United States ex rel. Hendow v. Univ. of Phx., 461 F.3d 1166, 1174 (9th Cir. 2006).)

      The AKS is a criminal statute intended to discourage kickbacks to people with influence over healthcare decisions that might be disguised as legitimate business transactions.  When a violation of the AKS leads to a claim for government

reimbursement for healthcare services, that claim is a false claim for FCA purposes. 42 U.S.C. § 1320a-7b(g). Under such a theory, a relator must establish "that the defendant (1) 'knowingly and willfully' (2) offered or paid remuneration, (3) 'to induce' the purchase or ordering of products or items for which payment may be made under a [f]ederal healthcare program." (ECF No. 56 at 9 (quoting 42 U.S.C. § 1320a-7b(b)(2)(B)).)

With respect to pleadings alleging fraudulent claims under the FCA, the Ninth Circuit requires relators "to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" Ebeid, 616 F.3d at 998 (quoting United States ex rel. Grubbs v. Ravikumar Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)); see also §1298 Pleading Fraud with Particularity—Extent of Requirement, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.) (explaining this standard is used in the First, Fifth, and Ninth Circuits). A relator need not "identify representative examples of false claims to support every allegation"; that is "simply one means of meeting the pleading obligation." Id. at 998. The allegations must be specific enough to inform a defendant of the misconduct so it may construct an informed defense. Id. at 999.

Generalized allegations unsupported by specific instances of wrongdoing are insufficient to meet these pleading requirements. See, e.g., Dalitz v. AmSurg Corp., No. 2:12-cv-2218-TLN-CKD, 2015 WL 8717398, *2 (E.D. Cal. Dec. 15, 2015) (allegations "that the conduct that the Relators observed during their employment with AmSurg represents the standard practice of the entire AmSurg corporate enterprise," and that "[o]ther ASCs controlled by AmSurg are committing the same type of conduct," were conclusory and insufficient without further factual allegations); Uchytil on behalf of United States v. Avande, Inc., CASE NO. C12-2091-JCC, 2018 WL 4150889, at *1 (W.D. Wash. Feb. 27, 2018) (relator's allegations of misconduct "beginning in May 2010 and continuing at least until the time [she] left," did not sufficiently allege misconduct beyond 2012). Understanding that it is unreasonable to think any relator could plead details of every instance of fraud when that information is uniquely held by the

defendants, Courts have found a broader practice is pled sufficiently when specific allegations support the alleged scope of the practice. See, e.g., Fiederer, 2014 WL 4666531, at *5-*6 (finding relator sufficiently pled a scheme that extended beyond the time she was employed with the defendant, where she alleged with specificity an "unwritten policy to alter patient charts," including training she received when hired, a consistent bonus policy for new patients, directions given to relator by her director, and incidents of the director's misconduct consistent with these policies).

### 1. Geographic Scope

Relator contends that its pleadings describe a nationwide scheme and provide specific examples of that scheme, supporting nationwide discovery sufficient to prove that scheme. (ECF No. 104 at 8-9.) Defendants argue that the well-pleaded allegations in five states do not support discovery beyond those regions and that Relator's generalized allegations of a "nationwide scheme" are insufficient to support extending the scope beyond the state where Relator has pled sufficiently specific kickbacks. (ECF No 103 at 8.) On close examination, the Operative Complaint adequately alleges a nationwide scheme related to the federal FCA causes of action because Relator provided details of national training, sales tracking, and compensation directed at implementing the fraudulent practices and identified specific circumstances demonstrating the same in several geographic regions.

Defendants are correct that the many generalized allegations, such as those accusing Defendants of using a "pervasive nationwide kickback scheme developed by Abbott management and ratified at the highest levels of the Company, [to develop] a loyal stable of referring and implanting physicians and hospitals in all states across the country, by providing them with illegal incentives in the form of patient referrals, free patient marketing and support services, lavish meals and cocktail parties, cash honoraria for sham speaker program and patient-practice building events, and lucrative promises to participate in future Abbott medical device studies," are not specific enough to support a nationwide claim. (See, e.g., ECF No. 85 at 86.) Relator's claims that

Defendant brags about developing sales channels and relationships with physicians resulting in record sales is similarly unhelpful, since Defendants could conceivably achieve such outcomes through legal means. (ECF No. 85 at 87); see Dalitz, 2015 WL 8717398, at *2 ("[A directive to increase the number of patients does not necessarily mean that AmSurg Corp. directed its ASCs to engage in the fraudulent practices alleged.").

However, in addition to these generalized statements, Relator detailed the content of certain training and management directives delivered to a national audience of sales representatives. Specifically, Relator explained that in August 2015, Defendants presented training to sales representatives with markets in Arizona, California, Connecticut, Florida, Illinois, Indiana, New York, and Ohio that provided a script outline "to convince the implanting physicians that they had 'an ideal opportunity to build their patient base from Abbott's referral physicians.'" (ECF No. 85 at 88.) At the same training, new hires were trained on how to use Defendants' Salesforce data to track whether the efforts at developing referring physicians were effective. (Id. at 88-89.) Relator alleged that Defendants' national Director of Structural Heart Marketing conducted a conference call in November 2015 to "make sure [the salespeople] were engaged in best-practices for referral-generating and practice-building activity planning with targeted implanters and referral physicians." (Id. at 89.)

At an April 2016 National Sales Meeting attended by the National Sales Director, managers representing all states in the U.S., the U.S. Marketing Management team, and all Therapy Development Specialists, Relator alleges that Sales Representative Linda Morgan presented on "Implanter Driven Programs." (Id. at 96-97.) Morgan, who worked in the Northeast Region, specifically "identified three medical centers where she focused her referral outreach efforts and noted her success at obtaining referrals from each location over the past three months, including Montefiore Medical Center with 3 referrals, NorthShore University Medical Center with 5 referrals, and NYU with 14 referrals." (Id.) Relator alleged that Morgan trained new hires on how to generate

referrals for implanting physicians, detailing how she had generated referrals to Dr. G.T. by hosting community events for Dr. G.T. to meet prospective patients and referring physicians and arranging for Dr. G.T. to attends rounds at neighboring hospitals. (Id. at 97.)

According to the Operative Complaint, Defendants' second quarter 2016 Incentive Compensation Calculator and Incentive Plan for Therapy Development Specialists specified a metric for increasing the implanting of Defendants' cardiac device by targeted implanting physicians. (Id. at 91.) Relator details how Defendants required salespeople to track data in a way that facilitated practice-building. Specifically, whenever Defendants' cardiac device was used in a medical procedure, the salesperson was required to input data about the referring physician, the implanting physician who performed the procedure, the number of Defendants' cardiac devices that were used, and the name of the hospital where the procedure was performed into a Salesforce database. (Id. at 93.)

These are specific factual allegations that support the plausible inference that Defendants were training and directing their salespeople across the country to advertise and deliver practice building for implanting physicians, rather than simply educating them about Defendants' cardiac device and its uses. (See ECF No. 56 at 14-15.) The fact that Relator has successfully pleaded FCA violations in geographically disparate states and under different regional management further supports this inference. Defendants do not contest that the District Court found Relator pleaded detailed circumstances sufficient to support FCA violations in California, Arizona, Florida, Georgia, and New York. It is significant that the allegations relative to these various states involve not only different sales representatives, but also different regional management. (See id. at 95 (describing practice-building activities of Relator at the direction of her manager, Michael Meadors, in California), 96 (describing practice-building actions taken by sales representatives Michelle Butler and Scott Reynolds at the behest of their manager, Frank Sobczak, in Florida), and 96-97 (describing practice-building activities of sales

representative Linda Morgan in New York).) This strengthens the inference that the kickback and practice-building scheme was not a misguided, local approach to the national sales strategy, but was instead characteristic of the practices Defendants' national sales management promoted. United States. ex rel. Spay v. CVS Caremark Corp., 913 F.Supp.2d at 178 ("[T]he sheer number of claims identified by Plaintiff in at least three states and Puerto Rico suggests, without need for speculation, that Defendants' reporting practices likely occurred at Defendants' other facilities throughout the country."); cf. Dalitz, 2015 WL 8717398, at *2-*3 (finding relator did not sufficiently plead a national, or even state-wide, scheme where specific fraud allegations were limited to one facility and defendant's declaration indicated that the functions at-issue were not handled at the national level, but at the local level).

### 2. Temporal Scope

While Relator maintains that her allegations support discovery for the period from January 1, 2013, to December 31, 2021, Relator "does not contest" the time frame provided in the Court's tentative ruling, August 2015, through February 14, 2020. (ECF No 104 at 2-3.) Relator argues that the length of Relator's employment should not restrict its FCA claims, because such limits would "place 'limits on qui tam actions that do not exist for government-initiated actions' and 'dissuade whistleblowing by limiting a relator's claim, not to the plausible allegations regarding the submission of false claims—which is the Act's focus—but to the duration of the relator's employment, on which the Act is silent.'" (ECF No. 104 at 10 (quoting Fiederer, 2014 WL 4666531, at *5).) Relator contends that the Operative Complaint contains allegations of fraudulent conduct from 2013 to 2021, including payments from Abbott and government healthcare programs to physicians targeted by Relator. (ECF No. 104 at 11.)

On the other hand, Defendants argue that Relator's federal claims are limited to October 23, 2015, to February 28, 2017, when Relator's Operative Complaint pleads specific kickbacks. (ECF No. 103 at 2, 4, 5, 9.) Defendants claim that representative claims pled with specificity must have the same general time frame as all discoverable

claims, so discovery should be limited to those sixteen months. (ECF No. 103 at 9 (citing United States v. Aurora Las Encinas, LLC, Case No. LA CV10-01031 JAK (RZx), 2012 WL 12897081, at *4 (C.D. Cal. Sept. 6, 2012)[7]).) Relator's allegations about the submission of claims, Defendants allege, do not demonstrate that the kickbacks were ongoing. (Id. at 10.)

      Consistent with the general approach discussed above, the Court again looks to the well-pleaded allegations in the Operative Complaint. Courts have refused a defendant's request to limit discovery to the period of a relator's employment where the discovery sought is relevant to the relator's claims. See, e.g., Fiederer, 2014 WL 4666531, at *5; Dalitz, 2015 WL 8717398, at *3-*4. Allegations of a plausible larger policy and practice of misconduct justify discovery in support of the scope alleged. Fiederer, at *5-6.

      Relator does not contest Defendants' assertion that it has not pleaded any specific kickbacks outside of October 23, 2015 to February 28, 2017; instead it maintains that the Operative Complaint "includes multiple allegations of fraudulent conduct both before October 23, 2015, and after February 28, 2017, including examples of physicians who Relator targeted and who received payments from Abbott and the government Healthcare Programs, and numerous examples highlighting Abbott's payments and Government reimbursements to physicians through 2021." (See ECF No. 104 at 11.) Relator primarily[8] relied on aggregate information in the Operative Complaint about

---

[7] The Court has reviewed United States v. Aurora Las Encinas, LLC, and finds it to be of limited use in this case for multiple reasons. First, it is procedurally distinguishable in that it involves a district court's review of a magistrate judge's highly discretionary discovery ruling for being contrary to the law or clearly erroneous, a deferential standard. 2012 WL 12897081, at *3. Second, it is factually distinguishable in that the parties in Aurora disputed specific discovery disputes that permitted the judge to meaningfully consider proportionality, burden, and patient privacy concerns. Id. Finally, the district court's discussion of the scope of the pleadings relied heavily on reasoning from United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493, 510 (6th Cir. 2007), which was disapproved by the Ninth Circuit in Ebeid, 616 F.3d at 998-99. Aurora, 2012 WL 12897081, at *4-*5.
[8] It appears from an alleged statement from Meadors to Relator that Defendants had been engaged in

payments made to physicians by government healthcare programs and Abbott over large time frames. For instance, Relator claims "[t]he total estimated payments made by the Plaintiff-States' Medicaid healthcare programs to physicians and hospitals for the [cardiac device procedure] procedure from November 2013 until December 2020 is approximately $1.6 million," and Relator provides the amounts that Abbott paid to various targeted physicians from 2015 through 2021 and payments to the same physicians from state healthcare programs from 2013 to 2020. (ECF No. 85 at 42, 94-98, 110.) The question, then, is whether these generalized allegations that Abbott continued to pay large amounts of money to the targeted physicians between 2015 and 2021, and that government healthcare programs paid claims related to implanting Defendants' device between 2013 and 2020, are sufficient to plead that the scheme continued beyond the specific kickback allegations.

There are two features of Relator's pleadings that persuade this Court to affirm its tentative ruling regarding the discoverable time frame. First, Relator's Operative Complaint alleges a sales and marketing policy based on practice-building for implanting physicians that existed when she began with the company and was reinforced by data collection and remuneration that rewarded such practices, and constant messaging about "owning the referral" and "filling and emptying the funnel." (See ECF No. 88 at 88-94.) Relator detailed several instances of national training consistent with this policy. (See, e.g., id. at 88 (Relator received training in 2015 that she should convince

---

the alleged practice-building conduct with Dr. S.K. prior to the Relator's employment. Because Relator indicates acceptance of the Court's tentative, the Court will not address this further. (See ECF No. 85 at 95 ("Mr. Meadors told Relator that Dr. S.K. had a long-standing, important relationship with Abbott, and this, it was imperative to "keep him happy[."] Relator quickly learned that Dr. S.K[.] was the top implanting [] physician in the world in terms of volume, and continually driving referrals to Dr. S.K. was one way that Abbott maintained this partnership relationship with Dr. S.K[.] and kept him happy. From 2015 to 2021, Abbott's payments to Dr. S.K. exceeded one million dollars ($1,404,280.64), and from 2013-2020 the state of California (MediCal) reimbursed Dr. S.K. $23,412.22 for the MC TMVR implanting procedure [(implanting Defendants' cardiac device)] for Medical covered cardiac patient beneficiaries.")

implanting physicians that Defendants' referrals would build their practices), 89 (Relator was asked to present on the importance of targeting cardiac surgeons for referrals at a national sales meeting in 2016), 96-97 (Linda Morgan presented on "Implanter Driven Programs," detailing how she hosted referral events for targeted physicians), 106 ("The sales team even received training on how to drive patient referrals to implanting physicians at an internal April 2016 Implanter Driven Programs presentation.").) Relator also gave examples of how she and others implemented the policy she alleged, as demonstrated by the surviving claims. These allegations satisfy the Court that Relator has sufficiently pled a policy that warrants discovery. See Fiederer, 2014 WL 4666531, at *6 (finding allegations of unwritten policy to alter patient charts satisfied Rule 9(b) where (1) she was trained to alter patient charts, (2) she was informed of a bonus policy for new patient referrals, and (3) the director altered patient charts consistent with the policy).

Second, Relator described Defendants' lack of responsiveness when she raised concerns about practice-building, which suggests the policy was permitted to continue. In one example, Relator alleges:

> During a November 12, 2015 meeting that included Abbott Account Manager, Nathan Foreman ("Foreman"), and Meadors, Foreman told Relator that he/she would only get credit for hosting events and activities in connection with targeted account hospitals in Los Angeles, if the patients who were treated with the MC Device were referred from specific referral physicians and were treated by specific implanting physicians. Relator expressed concern that this approach sounded like "practice-building" – which is well known throughout Abbott, including by Relator and Relator's managers, to constitute a violation of the AKS – and Foreman indicated that he agreed with this conclusion. In response, Meadors abruptly ended the meeting, and shortly thereafter, Relator was informed that Los Angeles was no longer in his/her assigned sales territory.

(ECF No. 85 at 90-91.) Relator further alleges she reported her concerns about management's encouragement of practice-building to the Human Resources and Sales Departments and the Office of Ethics and Compliance, but never received any response

or acknowledgement of her concerns. (Id. at 98-99.) This, combined with the policy Relator pled and the ongoing claims and payments, gives rise to a plausible allegation that the practices Relator alleges continued beyond her employment. See Dalitz, 2015 WL 8717398, at *4 (lack of responsiveness to relator's complaints of regulatory violations plausible demonstrated that fraudulent practices were ongoing following the end of relator's employment).

**D.    Proportionality and Burden**

It bears noting that this dispute was presented to the Court in terms of the scope of the claims in the Operative Complaint. Because the parties elected to proceed in this all-or-nothing fashion based on the pleadings, they did not submit specific discovery requests for the Court to consider with respect to proportionality or burden. Similarly, Defendants have not submitted any evidence of burden to support their claim of disproportionality applicable to scope generally. (See ECF No. 103); Fed. R. Civ. P. 26(b)(1) (listing as a proportionality factor "whether the burden or expense of the proposed discovery outweighs its likely benefit"); cf. Dalitz, 2015 WL 8717398, at *3 (considering Defendants' declaration stating there is no central nationwide database to conclude discovery disproportionate and burdensome) and Uchytil, 2018 WL 4150889, at *3 (considering a submission "describing the extensive discovery efforts thus far" when addressing burden).

While the scope of a pleading may render discovery relevant, the burden of such discovery may counsel against full and complete discovery in the first instance. See United States ex rel. Spay v. CVS Caremark Corp., 2013 WL 4525226, at *7 ("Plaintiff has clearly satisfied Rule 9(b)'s pleading of a nationwide claim sufficient to entitle it to discovery to prove that claim. . . . On the other hand, the Court remains mindful of the fact that Defendants are national companies that have [worked for] over thirty Part D Plan sponsors nationwide, covering millions of lives and processing millions of prescription claims."). One can imagine that there may exist certain documents that can easily be produced on a nationwide basis, while others might best be produced

beginning with random samples. Depending on the burden of the requests, certain discovery might better be limited or phased. See id. at *7.

Moving forward, the Court expects the parties to meet and confer to shape discovery in a reasonable way to balance their competing concerns. See Jacobs, 2016 WL 4146077, at * 4. ("Defendants have complained that such discovery would be burdensome, but the Court does not have enough specific information about the documents potentially at issue to reach this conclusion. Further, the Court will order the parties to meet and confer in an effort to tailor discovery such that it is not overly broad or burdensome and limited to specific categories of documents.")

### III.     CONCLUSION

For the reasons discussed in this Order, the Court confirms its tentative order, and finds that the Relator's Operative Complaint alleges a nationwide claim of FCA violations, warranting **nationwide** discovery from **August 1, 2015, through February 14, 2020**, to the extent specific requests do not impose an undue burden or exceed the proportional needs of this litigation.

**IT IS SO ORDERED**.

Dated: October 10, 2023

Honorable Michael S. Berg
United States Magistrate Judge